**UNITED STATES of America,
Plaintiff,**

v.

**Henry T. NICHOLAS, III and William
J. Ruehle et al., Defendants.**

**Case No. SACR 08–00139 CJC.**

United States District Court,
C.D. California,
Southern Division.

Dec. 29, 2008.

**1118**

Robb Christopher Adkins, Gregory W. Staples, Andrew D. Stolper, AUSA—Office of U.S. Attorney, Criminal Division, Santa Ana, CA, for Plaintiff.

Jack P. DiCanio, Lavanya Mahendran, Richard Marmaro, Matthew Eric Sloan, Matthew Donald Umhofer, Skadden Arps Slate Meagher and Flom LLP, Los Angeles, CA, Kevin M. Downey, Malachi B. Jones, Tobin J. Romero, Barry S. Simon, Brendan V. Sullivan, Jr., Negar Tekeei, Lance A. Wade, Marcie R. Ziegler, Williams and Connolly LLP, Washington, DC, James D. Riddet, Stokke and Riddet, Santa Ana, CA, for Defendants.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS PRIVILEGED EMAIL AND GRANTING GOVERNMENT'S APPLICATION TO DISCLOSE PRIVILEGED EMAIL

CORMAC J. CARNEY, District Judge.

### INTRODUCTION

Defendant Henry T. Nicholas, III ("Dr. Nicholas") and the government have filed competing motions regarding an email entitled Brett's Home Run ("Email") that Dr. Nicholas sent to his estranged wife, Stacey, from his Broadcom email account. In the Email, Dr. Nicholas admits to engaging in certain misconduct and making various misrepresentations in his capacity as CEO of Broadcom. Five years after Dr. Nicholas sent the Email, the government became aware of the Email during its 2007 criminal investigation of Dr. Nicholas and the stock option granting practices at Broadcom. In the course of the government's investigation, Broadcom representatives provided the Email to the government. Soon after learning that the government had a copy of the Email, Dr. Nicholas asserted that the Email was a privileged marital communication and de- manded that the government return the Email to him. The government refused and maintained that the Email was not a privileged communication. Ultimately, the parties requested that the Court resolve this dispute, and the Court found that the Email was not a privileged communication. However, the Ninth Circuit reversed, holding that the Email was a privileged marital communication, but did not require that the government return the Email to Dr. Nicholas.

Dr. Nicholas now moves to preclude the government from disclosing the Email to Dr. Nicholas' co-defendant William J. Ruehle ("Mr. Ruehle") and from using the privileged Email for cross-examination or impeachment of Dr. Nicholas should he testify at trial. The government opposes Dr. Nicholas' motion and moves for permission to disclose the Email to Mr. Ruehle so he can prepare his defense to the charges against him. The government also believes the Court's ultimate decision regarding the parties' competing motions should be made public.

After carefully considering the evidence presented by the parties and the arguments of their counsel, the Court believes that the Email must be disclosed to Mr. Ruehle. As the Ninth Circuit recognized, the Email may be admissible at trial notwithstanding the privilege. The government may be able to use the Email to impeach Dr. Nicholas should he give exculpatory testimony at trial that contradicts the incriminating statements in the Email. The Court may allow the government to use the Email for impeachment purposes as the jury's interest in finding the truth may outweigh Dr. Nicholas' confidentiality in a troubled marriage. The incriminating statements in Dr. Nicholas' Email may also be admissible against Mr. Ruehle as a

co-conspirator admission should the government establish that Dr. Nicholas made the incriminating statements during and in furtherance of the alleged conspiracy charged against Dr. Nicholas and Mr. Ruehle. Under Rule 801(d)(2)(E) of the Federal Rules of Evidence, statements made by one co-conspirator to conceal an ongoing conspiracy are deemed to be in furtherance of the conspiracy and are imputed admissions of another co-conspirator. Given the possibility that Dr. Nicholas' incriminating statements in the Email may be admissible at trial, Mr. Ruehle must be advised of that possibility and be provided a copy of the Email so he can adequately prepare his defense.

The Court also believes that this order regarding the Email should be made public. Transparency is the hallmark of a fair and equitable system of justice, and as the Ninth Circuit has held, "[t]he presumption of openness ... is at the foundation of our judicial system." *CBS, Inc. v. District Court,* 765 F.2d 823, 825 (9th Cir.1985). Numerous people at Broadcom and within the government know of the Email's existence and its contents. Likewise, the *Orange County Register* has publicly reported on the Email and disclosed many of its contents. Under these circumstances, there is no compelling interest to keep the Court's order regarding the Email under seal. The Court cannot keep secret what is already public.

## BACKGROUND [1]

### A. The Email

In April 2002, Dr. Nicholas composed and sent the Email to his then-wife, Sta-

cey, from his Broadcom email account, using his company laptop. (Decl. of Robb Adkins, Nov. 10, 2008 ("Adkins Decl.") Ex. A.) The eighteen-paragraph email discusses the Nicholas' children, the breakup of the Nicholas' marriage, Dr. Nicholas' drug use, and various issues related to Broadcom. (*Id.*) Dr. Nicholas details business decisions made in his capacity as CEO of Broadcom. In one paragraph, Dr. Nicholas admits:

> I am still suffering the effects of going "cold turkey" [off drugs] but I'm getting better. The worst part is seeing the company falling apart because I am not fully functioning. However, I don't care about Broadcom anymore, I just feel like a liar to the people I am recruiting into new positions ... because I am potentially fucking some things up this week that will be irreparably damaging. Fortunately, those results take at least a year to show up on our financial performance. However, I am willing to lie and bullshit to get key people in place so that I can extract myself from Broadcom as soon as possible.

(*Id.*) Dr. Nicholas also details his drug use and the effects thereof. (*Id.*) After ending his drug use "cold turkey," Dr. Nicholas writes that he experienced " 'panic attacks' " and " 'electric shock' like flashes" before and during a "wall-street conference call." (*Id.*) The Email concludes with a postscript in which Dr. Nicholas states that he will "not need [his then-wife's] help," but admonishes that "the things that effect [sic] my emotional fragility [around the time of the board and shareholder

---

1. The facts presented in this section are based, in part, on a declaration initially submitted by the government in camera and under seal, prior to the grand jury's return of the indictment. Dr. Nicholas may be unaware of many of these facts. Given the Court's ruling on the potential admissibility of

the Email at trial, in fairness, Dr. Nicholas must be apprised of the facts surrounding the discovery and subsequent disclosure of the Email. As an indictment has been returned, the government does not object to the disclosure of this information.

meetings] will affect a lot of other people (even you as a large shareholder)." (*Id.*)

Dr. Nicholas sent the Email from his Broadcom email account through the company server, using his company laptop. (Decl. of Robb Adkins and Andrew Stolper, Sept. 10, 2007 ("Adkins/Stolper Decl.") ¶ 6.) Dr. Nicholas chose not to apply password protection to his Broadcom laptop or otherwise limit unauthorized access, and approximately ten Information Technology ("IT") staff members had the capacity to access Dr. Nicholas' laptop. (*Id.* ¶ 9.) Dr. Nicholas also engaged in a regular practice of handing a cloned, unprotected copy of his laptop to his traveling staff, including his limousine driver, airplane pilot, and secretary. (*Id.* ¶¶ 11, 15.) Dr. Nicholas authorized several Broadcom employees to create back-up copies of his emails, which required the employee to open and compare emails with the back-up copy. (*Id.* ¶¶ 8–11; Def.'s Mot. Ex. 2 at 14.) Although emails sent from Dr. Nicholas' company laptop were not stored on the Broadcom server, Dr. Nicholas' sent items were backed up at regular intervals by Broadcom's IT staff. (Adkins/Stolper Decl. ¶¶ 8–10.)

In 2002, Timothy Duchene, a member of Broadcom's IT department, found the Email on Dr. Nicholas' laptop while he was engaged in the authorized maintenance and back-up of Dr. Nicholas' email account. (*Id.* ¶ 15.) Around the same time, Scott Smith, another member of Broadcom's IT department who worked closely with Dr. Nicholas, became concerned about Dr. Nicholas' erratic conduct and possible drug abuse. (*Id.* ¶ 5.) Mr. Smith brought these issues to the attention of Henry Samueli, Broadcom's Co–Chairman of the Board of Directors, who asked Mr. Smith to obtain more proof of Dr. Nicholas' conduct. (*Id.*) According to Mr. Smith, Dr. Samueli authorized Mr. Smith

to obtain this information by "any means necessary"—including searching emails sent on the Broadcom server. (*Id.*) Mr. Smith, who knew of the existence of the Email, asked Mr. Duchene to retrieve a copy of it from a back-up of Dr. Nicholas' laptop. (*Id.*) Per Mr. Smith's request, Mr. Duchene retrieved the Email and gave a copy of it to Mr. Smith. (*Id.*) (Mr. Duchene also shared the Email with Bryan Maine, another member of Broadcom's IT staff. (*Id.* ¶ 15))

Mr. Smith returned the copy of the Email to Mr. Duchene, but notified Broadcom's General Counsel, David Dull, of the existence of the Email. Mr. Dull then asked Dave Shaw, another member of the IT department, to retrieve a copy of the Email for him. (*Id.* ¶ 5.) Mr. Shaw provided Mr. Dull with a copy of the Email as well. (*Id.* ¶ 6.) Mr. Dull then gave Mr. Smith a copy of the Email, and Mr. Smith provided the Email to Dr. Samueli, a person identified as Aranoff, and another unidentified individual. (*Id.*) Mr. Smith also retained an electronic copy of the Email for his own personal records. (*Id.*) Upon reading the Email, Dr. Samueli became very concerned and asked Mr. Smith to make additional copies of the Email. (*Id.*)

During the summer of 2002, Broadcom's Director of Human Resources, Nancy Tullos, also learned of the Email's existence and directed Mr. Smith to retrieve the Email for her records. (Def.'s Mot. Ex. 2 at 17, Ex. 1 at 5.) Per Ms. Tullos' request, Mr. Smith sent a copy of the Email to Mr. Dull and Ms. Tullos. (*Id.*) Ms. Tullos then saved a copy of the Email to her hard drive. (*Id.* Ex. 2 at 17.) Several Broadcom executives and employees subsequently learned of and saw the Email, including Alan "Lanny" Ross, Werner Wolfen, Timothy Langan. (Adkins/Stolper Decl. ¶¶ 20, 22, 25.) The Email remains in the possession of Broadcom. (Adkins Decl. Ex. B

(Decl. of Kenneth R. Heitz ("Heitz Decl.") ¶ 5).)

On June 1, 2007, in the course of the government's investigation of Dr. Nicholas and Broadcom's stock option granting practices, Ms. Tullos' attorneys met with the government and provided the government with a copy of the Email. (Adkins Decl. ¶ 4.) The government had never seen the Email, did not know of its existence, and did not request it. (*Id.*) However, Ms. Tullos had previously provided the Email to the Securities and Exchange Commission ("SEC") pursuant to an administrative subpoena. (*Id.*)

Dr. Nicholas was aware that Broadcom possessed the Email and that many employees had access to it, but took no efforts to maintain its privacy until he first raised the claim of privilege in July of 2007. Dr. Nicholas' attorneys contacted the Office of the United States Attorney ("USAO") and demanded the return of the Email, claiming that the Email was a privileged marital communication. (Def.'s Mot. Ex. 2 at 16–19.) The USAO responded that the assertion of privilege was not well taken. (*Id.* at 23–24.) However, the USAO proposed that it would preserve the issue of privilege for presentation to the criminal duty judge within 60 days and agreed not to use the Email in its continuing investigation. (*Id.* at 30–31.) Subsequently, Dr. Nicholas filed a motion for a protective order with this Court.

### B. Procedural History

In his motion for a protective order, Dr. Nicholas claimed that the Email was a privileged marital communication. Dr. Nicholas requested a court order prohibiting the use of the Email in the government's investigation and requiring the government to return the Email to him. The Court held that the Email was not a privileged marital communication "because (1)

the Nicholas' marriage had failed at the time of the communication; (2) Dr. Nicholas had no reasonable expectation of privacy in the email; and (3) Dr. Nicholas waived any privilege he may have asserted over the email by failing to take reasonable steps to secure its confidentiality." *In re Grand Jury Investigation,* Order at 2 (C.D.Cal. Sept. 25, 2007).

Dr. Nicholas then appealed the Court's ruling to the Ninth Circuit. The Ninth Circuit stayed the Court's order and ordered briefing by the parties. On November 27, 2007, the Ninth Circuit vacated the Court's order, holding that the Email was a privileged communication, and ordered the Court to enter a protective order "precluding the introduction of the privileged communication in judicial or grand jury proceedings." *In re Grand Jury Investigation,* Slip Op. at 15 (9th Cir. Nov. 27, 2007). However, the Ninth Circuit declined to preclude the government from "using or retaining the email for any purpose." *Id.*

Per the Ninth Circuit's instructions, the Court entered a protective order. Believing that the Court's protective order was deficient, Dr. Nicholas filed a motion for clarification with the Ninth Circuit. In his motion, Dr. Nicholas requested that the Ninth Circuit clarify that the Email could not be used for "impeachment, rebuttal, and other purposes." *In re Grand Jury Investigation,* Slip Op. at 3 (9th Cir. Apr. 30, 2008). The Ninth Circuit declined to afford Dr. Nicholas the relief he sought. *Id.* at 4. Rather, the Ninth Circuit reiterated that "the only holding of our [prior] disposition" was that the "electronic communication is privileged as a marital communication." *Id.* The Ninth Circuit went on to hold:

> In order to ensure that Nicholas gets the benefit of the marital communications privilege to which he is entitled,

the district court may be required to undertake an individualized assessment of the specific facts and circumstances and exercise its discretion within the context of a trial, if there is one. The district court is best situated to make such determinations and exercise its discretion in the first instance to ensure the appropriate scope of protection for Nicholas' privileged communication pursuant to our case law and the spirit of our ruling.

*Id.* (internal citations omitted). The Court entered a revised protective order on May 20, 2008. Consistent with the Ninth Circuit's ruling, the Court's revised protective order provides that the Email may not be disclosed "in judicial or grand jury proceedings to the full extent of the marital communications privilege." *In re Grand Jury Investigation,* Order at 2 (C.D.Cal. May 20, 2008). On June 4, 2008, the grand jury returned an indictment against Dr. Nicholas and Mr. Ruehle for an alleged conspiracy related to stock options granting practices at Broadcom.

On October 20, 2008, after notification from the government that it intended to use the Email in preparation for trial and to disclose the Email to Mr. Ruehle, Dr. Nicholas brought the instant motion to suppress, again requesting that the Court preclude the use of the Email for trial preparation, cross-examination, or impeachment and prohibit its disclosure to Mr. Ruehle. On October 28, 2008, the government filed its *ex parte* application to unseal the documents filed in connection with the pre-indictment litigation regarding the issue of privilege or, in the alternative, provide these documents to Mr. Ruehle.

### C. Publication of the Email in the *Orange County Register*

On November 15, 2008, the *Orange County Register* ran a story that disclosed the existence of the Email, detailed its contents, and included excerpts from the Email. John Gittelsohn, *Ex–Broadcom CEO: Drugs Meant He Was 'Not Fully Functioning,'* ORANGE COUNTY REG., Nov. 15, 2008. In addition to providing a context for and overview of the Email, the story included the following direct quotations from the Email:

- "I deserve everything that is happening to me. I just wish I didn't have other people who depend on me and look to me to be their leader."

- "The worst part is seeing the company falling apart because I am not fully functioning."

- "However, I don't care about Broadcom anymore. I just feel like a liar to the people I am recruiting into new positions."

- Nicholas was "potentially [messing] some thing up that will be irreparably damaging. Fortunately, those results take at least a year to show up on our financial performance. However, I am willing to lie ... to get key people in place so that I can extract myself from Broadcom as soon as possible."

- "I had left the 'Easter torture session' in Beaver Creek and was immediately subjected to 40 different disasters at once."

- "I have never had so many things converge at once, and never after such a physically and emotionally debilitating one as the 26 hour Easter Day Ericsson/Mobilink call. During that week, I got only a few hours of sleep, and sustained myself by alternating huge quantities of caffeine and ephedrine. I also alternated smaller amounts of coke and crystal [methamphetamine]."

- Dr. Nicholas was recovering from "a violent and scary reaction" to drug withdrawal that included "'electric shock' flashes."

- "During my call I was experiencing 'panic attacks' and my hands were shaking."

- The article mentions an "event from hell" at the "warehouse," after which his wife left him.

- "It was 3:00 a.m. I was exhausted, depressed, suffering from ecstasy come-down, and at the end of my capacity to rationally think."

- "I did mention that you saw me with another woman in 'bed' and that I had spent a solid week abusing drugs after my Easter 'all nighter' to prepare for a huge acquisition."

- "Things unfortunately do not abate for me over the next two weeks."

- The article refers to "potentially very adversarial" meetings with shareholders and directors on April 27.

- "I will not need your help but if you could be aware that things that effect [sic] my emotional fragility around those dates will affect a lot of other people (even you as a large shareholder) it will help me do my job."

- Dr. Nicholas referred to "the lifestyle that Broadcom had forced me into."

*Id.*

The *Register* obtained the Email from Mr. Smith. *Id.* Mr. Smith previously had provided the Email to several Broadcom executives and also retained an electronic copy of the Email for his personal records. *Id.* (He subsequently gave a copy of the Email to the SEC and was asked about the Email by the FBI. *Id.*) Mr. Smith told the *Register* that he disclosed the Email in an effort to "stand[ ] strong for truth ... and also to protect the interests of Broadcom and its shareholders."[2] *Id.* Before publishing the Email, John Gittelsohn, the author of the story, contacted Dr. Nicholas' lawyers to inform them that the *Register* would be running the story. (Decl. of Tobin Romero, Nov. 24, 2008, Ex. A.) Brendan Sullivan, Jr., one of Dr. Nicholas' lawyers, responded to the editor of the *Register*, Ken Brusic, in a letter dated October 29, 2008. (*Id.*) In his letter, Mr. Sullivan informed Mr. Brusic that the Email was sent by Dr. Nicholas to "his wife at the time," and the contents of the Email were "protected by the spousal privilege" and "privileged." (*Id.*) Mr. Sullivan objected to the *Register* running any story on the Email. (*Id.*) Believing Dr. Nicholas' incriminating statements in the Email to be newsworthy and a matter of significant public concern, the *Register* went forward with its story on November 15, 2008, despite Mr. Sullivan's objection.

## ANALYSIS

As the Ninth Circuit recognized, the Email may be admissible at trial notwithstanding the privilege. The Court will have to make the ultimate determination of the Email's admissibility at trial after considering all of the facts and circumstances at that time. Because the Email may be admissible at trial, in fairness, the Email must now be disclosed to Mr. Ruehle. Finally, in light of the disclosure of the contents of the Email by the *Orange County Register*, the Court finds no compelling interest in keeping this order under seal.

### A. The Email May Be Admissible at Trial

 The marital communications privilege, like all evidentiary privileges, is not

---

**2.** To the Court's knowledge, Broadcom has never disclosed the Email or its contents to its shareholders.

absolute and is construed narrowly because "[p]rivileges obstruct the search for the truth." *United States v. Roberson*, 859 F.2d 1376, 1378 (9th Cir.1988). Even the most sacrosanct privileges must give way to the jury's obligation to find the truth in some circumstances. In this case, the Email may be admissible to impeach Dr. Nicholas if he gives exculpatory testimony at trial that contradicts the incriminating statements in the Email. The Email may also be admissible against Mr. Ruehle as an admission of a coconspirator. The Court holds only that there is a possibility that the Email may be admissible against Dr. Nicholas or Mr. Ruehle, but the Court cannot make the ultimate determination of whether the Email will, in fact, be admissible against either defendant outside of "the context of a trial, if there is one." *In re Grand Jury Investigation*, Slip Op. at 4 (9th Cir. Apr. 30, 2008).

### 1. The Email May Be Admissible to Impeach Dr. Nicholas

The Ninth's Circuit's ruling on the issue of privilege recognizes that the Email may be admissible to impeach Dr. Nicholas if he gives exculpatory testimony that contradicts his incriminating statements in the Email. The Ninth Circuit held that the privilege afforded the Email is not absolute and recognized the possibility that the Email may be used at trial. In its first ruling, the Ninth Circuit refused to preclude the government from "using or retaining the email for any purpose," as Dr. Nicholas requested. *In re Grand Jury Investigation*, Slip Op. at 15 (9th Cir. Nov. 27, 2007). And in response to Dr. Nicholas' request for clarification that the Email could not be used for impeachment, the Ninth Circuit declined to restrict the use of the Email in this way. Instead, it held simply: "[i]n order to ensure that Nicholas gets the benefit of the marital communications privilege to which he is

entitled, the district court may be required to undertake an individualized assessment of the specific facts and circumstances and exercise its discretion within the context of a trial, if there is one." *In re Grand Jury Investigation*, Slip Op. at 4 (9th Cir. Apr. 30, 2008). Thus, for a second time, the Ninth Circuit specifically declined to hold that the Email could not be used for any purpose, including impeachment or rebuttal. *Id.* Rather, the Ninth Circuit held that the "appropriate scope of protection for Nicholas' privileged communication" must be determined pursuant to the relevant "case law." *Id.* at 3.

Relevant precedent confirms that precluding the use of the Email for any purpose would exceed the "appropriate scope of protection" to which the Email is entitled. Evidentiary privileges are not absolute, and the jury's obligation to consider relevant, probative evidence may outweigh any interest in keeping privileged information from it. In *Harris v. New York*, the United States Supreme Court held that statements obtained in violation of a defendant's Miranda rights, while inadmissible in the government's case-in-chief, can be used to impeach a defendant, if he testifies. The Supreme Court held:

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.... The shield provided by Miranda cannot be perverted into a license to use perjury by way of defense, free from the risk of confrontation with prior inconsistent utterances.

*Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). The Supreme Court recognized that the Miranda right, while fundamental and constitutionally based, is not a license to lie. Likewise, the Ninth Circuit has recognized that the attorney-client privilege can be

waived when a defendant testifies about the substance of privileged communications. *See United States v. Plache*, 913 F.2d 1375, 1379–80 (9th Cir.1990) (holding that voluntary disclosure of privileged communication during the course of testimony constitutes waiver of the privilege). *Mathison v. Hillhaven Corp.*, 895 F.2d 1417 (9th Cir.1990) (unpublished table decision) (recognizing that "otherwise privileged testimony is admissible for impeachment").

The marital communications privilege does not preclude the introduction of privileged communications for impeachment insofar as the defendant's testimony constitutes waiver of the privilege. The Tenth Circuit noted that *Harris* "supports the trial court's ruling that otherwise inadmissible testimony involving the martial communications privilege can be used to impeach a defendant who testifies on his own behalf." *United States v. Neal*, 743 F.2d 1441, 1448 (10th Cir.1984) (Logan, J., concurring).[3] In *United States v. Benford*, the defendant planned to testify on his own behalf, and sought to assert the privilege to prevent his spouse from testifying and contradicting the exculpatory statements he planned to make.[4] 457 F.Supp. 589, 597 (E.D.Mich.1978). The district court ruled that if the defendant's wife "were willing to testify she would be per-

mitted to testify as to matters directly involved in his testimony" notwithstanding the privilege. *Id.* The defendant argued that the district court's ruling denied him the right to testify in his own defense. *Id.* The district court disagreed and noted that defendant sought "to take advantage of his wife's forced silence" and to invoke the privilege "for a purpose it was never meant to cover." *Id.* Thus, the district court held that the defendant's testimony, should he take the stand, would "open[ ] the door to a probing of the incidents he discusse[d]. In so doing, he [would] waive[ ] his marital privilege surrounding the substance of his testimony." *Id.* at 598. The district court also emphasized that it "should not lightly cast aside the benefits one is entitled to from the exercise of the privilege, but in the rare case in which that benefit is clearly outweighed by the cost involved, the privilege should not be unfairly extended." *Id.* at 597.

Dr. Nicholas particularly relies on *United States v. Hall* in support of his argument that the Email may not be used for purposes of impeachment or cross-examination, but this authority is inapposite.[5] In *United States v. Hall*, after the defendant testified on his own behalf, the prosecutor used an out-of-court statement of the defendant's wife to impeach his testimony. 989 F.2d 711 (4th Cir.1993). The Fourth

---

**3.** The Ninth Circuit, noting that "otherwise privileged testimony is admissible for impeachment," cited this opinion in *Neal* approvingly. *Mathison v. Hillhaven Corp.*, 895 F.2d 1417 (9th Cir.1990) (unpublished table decision).

**4.** The defendant in *Benford* sought to assert the marital testimonial privilege. Although the testimonial privilege is generally only held by the testifying spouse, in *Benford*, the testimonial privilege was held jointly because of the nuances of Michigan law. Accordingly, the court concluded that "the waiver rule applies to testimonial as well as communications privileges." 457 F.Supp. at 598.

**5.** Dr. Nicholas also cites *United States v. Sanchez*, 176 F.3d 1214 (9th Cir.1999), in which the Ninth Circuit held that the admission of the defendant's wife's statement was improper because the statement was inadmissible hearsay and its admission violated the defendant's rights under the Confrontation Clause. Here, the Email is Dr. Nicholas' own statement. Thus, it is not inadmissible hearsay and its admission would not implicate Dr. Nicholas' rights under the Confrontation Clause.

Circuit held that the wife's statement was inadmissible hearsay, and the use of this evidence to impeach the defendant implicated the defendant's rights under the Sixth Amendment's Confrontation Clause. *Id.* at 716. Although the Fourth Circuit noted that the admission of the statement implicated the marital communications privilege as well, the Fourth Circuit cautioned: "[o]f course, [the defendant] had an obligation to testify truthfully on cross-examination. However, even when the government believes a witness is lying, its methods of impeachment are constrained by the requirements of the Confrontation Clause." *Id.* at n. 10 (internal citations omitted). Here, the Email consists of Dr. Nicholas' own statements; it is not hearsay nor does its admission implicate Dr. Nicholas' rights under the Confrontation Clause. Nonetheless, Dr. Nicholas seizes on the fact that the Fourth Circuit, in dicta, noted that a prosecutor may not divulge the substance of inadmissible evidence under the guise of " 'artful cross-examination.' " *Id.* at 716. Dr. Nicholas overstates the significance of this language, and his reliance on it is misguided. Contrary to Dr. Nicholas' suggestion, the Fourth Circuit did not hold that an otherwise privileged communication could not be used to impeach a defendant who waives the privilege by giving exculpatory testimony that contradicts his own prior statements. Rather, the court's holding relies primarily on the hearsay and Confrontation Clause issues presented by the admission of the defendant's wife's statement. Where the privilege is waived by giving exculpatory testimony that contradicts the defendant's own prior statements,

impeaching the defendant with his prior statements is legitimate.

The Court will not speculate at this time as to whether the Email will be admissible at trial. As the Ninth Circuit recognized, the Court may only make an assessment regarding the admissibility of the Email in "the context of a trial, if there is one." *In re Grand Jury Investigation,* Slip Op. at 4 (9th Cir. Apr. 30, 2008). The Court must wait to see if there is a trial, if Dr. Nicholas testifies, if Dr. Nicholas gives exculpatory testimony that contradicts his incriminating statements in the Email, and if the government seeks to impeach Dr. Nicholas with the Email.[6] Should Dr. Nicholas waive the privilege, the jury's interest in finding the truth may outweigh Dr. Nicholas' interest in protecting the confidentiality of his troubled marriage.

### 2. The Email May Be Admissible Against Mr. Ruehle as a Co-Conspirator Admission

The Email may be admissible against Mr. Ruehle as an admission of a coconspirator. Under the Federal Rules of Evidence, "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is admissible against the party. FED. R. EVID. 801(d)(2)(E). As a threshold issue, Mr. Ruehle does not have standing to assert the marital privilege because Dr. Nicholas and his wife alone are the holders of the privilege. *United States v. Montgomery,* 384 F.3d 1050, 1058–59 (9th Cir.2004). Suppression of evidence can only be asserted by a party whose rights are implicated, and thus it is well settled that although the introduction

---

**6.** These are precisely the circumstances Dr. Nicholas' counsel previously argued could lead to the admission of the Email: *"If* Dr. Nicholas is charged *and* if he testifies *and* if, in that testimony, he waives the privilege protecting [the Email], nothing in Dr. Nicholas'

proposed protective order would prevent the court from reevaluating potential uses of the privileged communication at that time." (Mem. in Support of Petitioner's Proposed Protective Order, Jan. 22, 2008 at 4) (emphasis in original).

of evidence may violate one party's rights, it may nonetheless be admissible against a party who lacks standing to object.[7] *Alderman v. United States,* 394 U.S. 165, 172, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (holding that co-conspirators and co-defendants do not have standing to object to the introduction of communications obtained in violation of another co-conspirator's or co-defendant's rights); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (holding that evidence gathered in violation of one party's rights under the Fourth Amendment may be introduced against a co-defendant whose rights are not implicated notwithstanding the exclusionary rule).

Dr. Nicholas' statements in the Email arguably qualify as admissions of a coconspirator because Mr. Ruehle and Dr. Nicholas have been indicted as co-conspirators, (Indictment ¶¶ 2, 3), Dr. Nicholas wrote and sent the Email in April 2002, which was during the course of the alleged conspiracy, (Indictment ¶ 15), and Dr. Nicholas may have made the statements in the Email in furtherance of the alleged conspiracy.

 "[T]o be 'in furtherance' the statements must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy." *United States v. Kearns,* 61 F.3d 1422, 1426 (9th Cir.1995). The Ninth Circuit has recognized that statements need not be made to co-conspirators in order to further the objectives of the conspiracy. *United States v. Zavala–Serra,* 853 F.2d 1512, 1516 (9th Cir.1988). Statements made by a conspirator to his girlfriend informing the girlfriend of conspirator's "efforts to conceal the conspiracy" are statements in furtherance of the conspiracy. *See United States v. Bowman,* 215 F.3d 951, 961 (9th Cir.2000). A statement made by a conspirator to his girlfriend "in an effort to conceal the conspirators' illegal activities" is one made in furtherance of the objectives of the conspiracy. *United States v. Williams,* 989 F.2d 1061, 1069 (9th Cir.1993). Likewise, statements made by a conspirator to his wife "intended to preserve the conspiracy by frightening [her] in order to dissuade her from informing the authorities" about the scheme are made in furtherance of the conspiracy. *United States v. Westmoreland,* 312 F.3d 302, 310 (7th Cir.2002). Finally, statements a conspirator makes to his wife—even amidst "banter about paying bills, changing furnace filters, and car trouble"—that are intended to "assure [the spouse] of the conspiracy's viability" constitute statements that further the objectives of the conspiracy. *United States v. Roberts,* 14 F.3d 502, 515 (10th Cir.1993). Dr. Nicholas' postscript in which he warns his wife to be mindful that she, as a large shareholder in Broadcom, may be affected by Dr. Nicholas' actions, arguably suggests that Dr. Nicholas sent the Email in furtherance of the conspiracy. (Adkins Decl. Ex. A.)

The Court has insufficient evidence at this time to determine conclusively if the Email falls within the scope of Rule 801(d)(2)(E). Such a determination, however, is unnecessary at this time. What is necessary at this time is a determination of whether the Email could be admissible at trial against Mr. Ruehle as a co-conspirator admission. The Court can make this determination and finds that the Email definitively may be admitted at trial against him as such an admission.[8]

---

**7.** Dr. Nicholas would be entitled to a separate trial if the Email is admitted against Mr.

Ruehle as a coconspirator admission in the government's case-in-chief.

**8.** The potential use of the Email at trial as a

### B. The Email and the Court's Order Must Be Disclosed to Mr. Ruehle

██ Since the Email may be admissible at trial—either to impeach Dr. Nicholas if he waives the privilege or as a co-conspirator admission against Mr. Ruehle—the Email must be disclosed to Mr. Ruehle. If he did not learn about the Email while he was at Broadcom, Mr. Ruehle presumably now knows about the Email in light of its publication in the *Orange County Register*. In any event, he is entitled to access the Email in its entirety in order to understand Dr. Nicholas' statements in context. More importantly, he must be apprised of the Court's order and the fact that the Email may be admissible at trial. The Email and the fact that it may be admissible at trial are critical pieces of information to consider as Mr. Ruehle prepares for trial and crafts his defense strategy. Mr. Ruehle cannot learn of the possible admissibility of this significant piece of evidence in the midst of trial. That is simply not fair.

Contrary to Dr. Nicholas' assertion, disclosure of the Email and the Court's order to Mr. Ruehle is not inconsistent with the Ninth Circuit's ruling on the issue of privilege. The Court's protective order, which tracks the language of the Ninth Circuit's ruling, prevents the disclosure of the Email "in judicial or grand jury proceedings to the full extent of the marital communications privilege." *In re Grand Jury Investigation,* Order at 2 (C.D.Cal. May 20, 2008). The Ninth Circuit's ruling does not prohibit the use of the Email for impeachment or trial preparation.

Moreover, under the Federal Rules of Criminal Procedure, Mr. Ruehle has a right to discover the Email. Rule 16 provides that the government must disclose documents that are "material to preparing the defense" or that "the government intends to use ... in its case-in-chief at trial." FED.R.CRIM.P. 16(a)(1)(E)(i)-(ii). The Email is certainly material to the preparation of Mr. Ruehle's defense and Dr. Nicholas' statements in the Email may be used against Mr. Ruehle as admissions of a co-conspirator. Even more to the point, however, Mr. Ruehle has a right to a fair trial. Denying Mr. Ruehle access to the Email and keeping him in the dark regarding its potential admissibility— against either him or Dr. Nicholas—would be patently unfair to Mr. Ruehle. Dr. Nicholas' statements in the Email are incriminating. Mr. Ruehle must be given the opportunity to devise a strategy that minimizes the statements or distance himself from them. Both the Federal Rules of Criminal Procedure and the constitutional requirements relating to a defendant's pretrial rights recognize the importance of providing a criminal defendant with sufficient notice of the evidence against him so he may fairly defend against the government's charges. Mr. Ruehle needs to see the Email and be told of its potential admissibility at trial, and he needs to see it and be told of that potential admissibility now.

Dr. Nicholas suggests that because the Email is privileged it may not be disclosed to Mr. Ruehle. Dr. Nicholas argues that privileged documents may not be disclosed to third parties.[9] Dr. Nicholas has not,

---

co-conspirator admission does not implicate Mr. Ruehle's rights under the Confrontation Clause. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Bourjaily v. United States,* 483 U.S. 171, 183–84, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) ("[W]e hold that the Confrontation Clause

does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E).").

**9.** The legal basis for this argument is not as strong as Dr. Nicholas suggests, however. The Ninth Circuit, in denying a protective

however, provided any authority to suggest that his interest in confidentiality trumps Mr. Ruehle's rights to access information critical to the preparation of his defense. Furthermore, Mr. Ruehle has already learned about the existence of the Email as well as many of the statements contained therein after its publication in the *Orange County Register*. Mr. Ruehle is only unaware that the Email may be used to impeach Dr. Nicholas at trial and that the Email may be admissible as evidence against Mr. Ruehle at trial as a co-conspirator admission. Accordingly, Mr. Ruehle must be informed of these trial possibilities.

## C. The Court's Order Cannot Be Maintained Under Seal

The United States Supreme Court has held that the right to attend criminal proceedings "is implicit in the guarantees of the First Amendment." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 556, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). In extending this right to include not only access to criminal trials, but *voir dire* proceedings as well, the Supreme Court noted that "[t]he value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). Moreover, "[o]penness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.* at 508, 104 S.Ct. 819. The importance of allowing access to court records and proceedings is rooted in the understanding that "public examination, study, and comment" are "essential" to the proper functioning of the criminal justice system. *CBS, Inc. v. District Court*, 765 F.2d 823, 826 (9th Cir.1985). "Publishing sufficient information to allow the public to join in a dialogue about the courts and the treatment of defendants can only have a positive impact on the public's perception of our judicial system. If the system has flaws, it is all the better that these flaws be exposed and subjected to public comment." *United States v. Schlette*, 842 F.2d 1574, 1583 (9th Cir.1988). As the Ninth Circuit reminded, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Oregonian Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (quoting *Richmond Newspapers*, 448 U.S. at 572, 100 S.Ct. 2814).

Understanding the importance of the public's right to access criminal proceedings, the Ninth Circuit has held that the First Amendment's qualified right of access extends to certain pre-trial hearings, including hearings on motions to suppress. *United States v. Brooklier*, 685 F.2d 1162, 1167 (9th Cir.1982). Thus, the Court must "begin with the presumption that the public and the press have a right to access" hearings on motions to suppress and "documents filed therein." *CBS*, 765 F.2d at 825. "The presumption of openness may be overcome only by an over-

---

order prohibiting interrogation of a defendant's wife, explained that the "privilege relates only to testimony in judicial or grand jury proceedings." *In re Grand Jury Investigation of Hugle*, 754 F.2d 863, 866 (9th Cir. 1985). Although the defendant's assertion of the privilege required a protective order that would bar the presentation of compelled testimony protected by the marital communications privilege to the grand jury, the privilege itself was not an absolute bar to discovery.

riding interest based on findings that the closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* Closure of court records and proceedings, "although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness." *Press–Enterprise,* 464 U.S. at 509, 104 S.Ct. 819. Accordingly, criminal proceedings and documents may only be closed to the public consistent with the First Amendment if: "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no adequate alternatives to closure that would adequately protect the compelling interest." *Oregonian Publ'g,* 920 F.2d at 1466. Where the First Amendment supplies the right of access, "the burden is upon the proponent of closure to justify a closure order." *Id.* at 1467.

█ Neither the assertion of the privilege nor the fact that information is confidential alone is sufficiently compelling to justify sealing a court proceeding or record. A defendant's stated interest in " '[c]onfidentiality' is not some talismanic utterance that can justify a refusal to disclose the contents" of a court document. *Schlette,* 842 F.2d at 1583.[10] The assertion of the privilege, in the abstract, does not "trump" the First Amendment. *United States v. Hawkins,* No. 04–106, 2005 WL 3234509, at *3 (N.D.Cal. Jan. 10, 2005). The Ninth Circuit has recognized that where information a party seeks to keep

confidential is "already in the public record," a party's interest in confidentiality does not "override the presumption of openness that is at the foundation of our judicial system." *CBS,* 765 F.2d at 825–26.

█ In this case, the public has a presumptive right of access to the Court's order, and the public's strong interest in the openness of this judicial record can only be overcome by a compelling interest in closure. Dr. Nicholas asserts that his interest in preventing the further publication of the contents of his privileged Email is sufficiently compelling to warrant keeping the Court's order under seal.[11] He is mistaken. To the extent that the Court's order refers to privileged information, all of this information has already been made a matter of public record. The contents of the Email have been disclosed to, and published by, the *Orange County Register.* The Court's order does not quote any language from the Email that was not included in the *Register's* story. Furthermore, numerous current and former employees and executives at Broadcom are aware of, and have read, the Email, including Henry Samueli, Nancy Tullos, David Dull, Alan "Lanny" Ross, Werner Wolfen, Timothy Langan, Scott Smith, and at least three additional members of the IT staff. (Adkins/Stolper Decl. ¶¶ 6, 7, 17, 20, 22, 25.) The Email has also been produced to the SEC. (Adkins Decl. ¶ 4.) Even if it were confidential at one time, the Email is no longer a secret: Broadcom employees, numerous branches of government, the law-

---

10. In *Schlette,* the Ninth Circuit relied on the common law right of access in reaching its holding and did not reach the constitutional issue. However, the Ninth Circuit's reasoning is equally apposite with respect to the more protective standard under the First Amendment. *See United States v. Kaczynski,* 154 F.3d 930, 932–33 (9th Cir.1998) (Reinhardt, J., concurring).

11. Further adverse publicity four months before trial is also not a sufficiently compelling justification to keep this order under seal. The Court will endeavor to limit the effects of pre-trial publicity in jury selection and ensure that Dr. Nicholas gets the impartial jury to which he is entitled under the Sixth Amendment.

yers involved in this case, the parties, the press, and the public know its contents. The Court cannot keep secret what is already public.

Because the contents of the Email are now a matter of public record, no compelling justification exists for keeping the Court's order under seal. Dr. Nicholas' interest in preventing further dissemination of the already public information contained in the Email is not sufficient to override the public's constitutional right to understand the analysis of the legal issues presented to the Court regarding the Email. The public has a right to understand and scrutinize the Court's legal analysis and conclusions. The Court understands that Dr. Nicholas has not waived the privilege, and the Court will afford Dr. Nicholas the full protection of the marital communications privilege to which he is entitled at trial. However, insofar as the confidential information Dr. Nicholas seeks to keep under seal has been made public, the privilege does not justify shielding the Court's order from meaningful review and comment by the public.

## CONCLUSION

For the foregoing reasons, Dr. Nicholas' motion to suppress and for an evidentiary hearing is DENIED, and the government's application is GRANTED in part. The Court will unseal this order and make it a matter of public record in ten days unless otherwise directed by the United States Court of Appeals for the Ninth Circuit.