Filed 1/29/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTHONY WYATT CANNATA,<br><br>    Defendant and Appellant. | G048139<br><br>(Super. Ct. No. 10WF0041)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Carla Singer, Judge.  Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Anthony Wyatt Cannata appeals from the judgment following his conviction on one count of continuous sexual abuse of a child (Pen. Code, § 288.5, subd. (a); all further statutory references are to this code unless otherwise specified). He was sentenced to 12 years in prison.

Defendant's conviction came in his second trial, after his first trial ended in a hung jury. He claims the trial court erred in the second trial by ruling that, if he elected to testify on his own behalf, his statements to a staff member at a psychiatric hospital could be used by the prosecutor for impeachment. According to defendant, this ruling improperly forced him to choose between testifying on his own behalf and maintaining the confidentiality of his privileged psychotherapy communications. We conclude the asserted privilege does not apply and therefore reject this contention.

Defendant also contends the judgment must be reversed because the trial court instructed the jury with CALCRIM Nos. 1110 and 1120, which, he argues, omit a required element of the charged crimes, i.e., that the lewd or lascivious acts were committed "in a lewd or sexual manner." We conclude the omission, if it was one, was harmless. Given the nature of the acts described by the victim, and the jury's express finding he had engaged in masturbation with her, there is no reasonable possibility the jury believed his conduct with the victim was innocuous.

The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant's stepdaughter, A., told her mother, defendant's wife, he had been sexually abusing her over an extended period of time. A's mother reported the alleged abuse to the Cypress Police Department, located in Orange County, and contacted defendant by telephone. Defendant, who had just learned of A's disclosure to both

neighbors and to his wife, told her he was on his way to his brother's house in Long Beach and was contemplating committing suicide. Defendant's wife then reported this information to a member of the Cypress Police Department. Long Beach police thereafter arrested defendant at his brother's home. Because of defendant's suicidal threats, the police transported him to College Hospital in Los Angeles County.

Defendant was admitted to the hospital on a 72-hour involuntary hold in accordance with Welfare and Institutions Code section 5150. According to Christal Verduzco, a hospital nurse, when a patient is brought to College Hospital on an involuntary hold, a psychiatrist evaluates the patient, to confirm the basis for the hold and to assess the patient's condition. In this case, defendant was seen by Dr. Fidel. In the course of this meeting, defendant mentioned having engaged in child sexual abuse. Fidel thereupon suspended the evaluation, to locate a nurse to witness defendant's statements.

Verduzco accompanied Fidel back into the evaluation room, and joined the discussion with defendant. Fidel then told defendant he wanted him to tell the nurse what he had already disclosed. Defendant then told Verduzco he had been brought to the hospital because he was feeling suicidal. He had fought with his wife because she found out he had been sexually abusing her daughter. Verduzco "asked questions for specifics," so that she could prepare a mandated report about the abuse. She asked defendant about the types of sexual acts they had engaged in, how often, how long it had been going on, and whether it was consensual. He disclosed that the two of them had engaged in oral sex, had engaged in touching each other, and he had penetrated her vaginally with a finger; but he denied they engaged in intercourse. He claimed the acts were consensual. After defendant had disclosed the information, Verduzco informed him she would have to report it to the Los Angeles Department of Children and Family Services (DCFS).

3

Verduzco did not know defendant's conduct had already been reported to the police in Cypress. She explained that, if an incident of child sexual abuse had been reported to authorities, she would not be required to make a second report. After Verduzco's interview with defendant concluded, she made a telephonic report to DCFS. She asked whether DCFS had already received a report about it, and was told they had no such record. Verduzco then followed up her telephonic report with a written report.

When defendant was first tried, he moved to exclude from evidence any statements he had made to Verduzco. His motion was based on his contention those statements were protected by the psychotherapist-patient privilege. (Evid. Code, § 1014.) The court took testimony from Verduzco, outside the presence of the jury, and then granted the motion to exclude the evidence based on the psychotherapist-patient privilege. Defendant then testified on his own behalf. The jury was unable to reach a unanimous verdict and the court declared a mistrial.

Before defendant's second trial, the prosecutor filed a brief, arguing that, if defendant elected to testify, his statements to Verduzco would be admissible to impeach him. The prosecutor relied on *People v. Macias* (1997) 16 Cal. 471, 739, 752 for the proposition that, in the wake of the voters enactment of the "Right to Truth–in–Evidence" provision (Cal. Const., art I, § 28, subd. (f), par. (2)), as part of Proposition 8, statements obtained from a defendant in violation of his right to remain silent – what the prosecutor referred to as "*Miranda* defective statements" (see *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*)) – were nonetheless admissible for impeachment purposes if the defendant elected to testify.

Defendant responded to the prosecutor's brief by filing a motion to once again exclude his statements to Verduzco, even for impeachment purposes. Defendant again argued the statements were protected by the psychotherapist-patient privilege, and claimed the prosecutor was in effect asking the court to "judicially create an

4

impeachment exception to the psychotherapist-patient privilege." The trial court again concluded the statements were covered by the psychotherapist-patient privilege, and initially concluded they would be inadmissible at trial for any purpose, even if defendant testified on his own behalf.

But the court later changed its ruling. The court explained it had reviewed a federal district court case, *United States v. Nicholas* (C.D. Cal. 2008) 594 F.Supp.2d 1116 (*Nicholas*), and found persuasive its explanation why a marital communication between a defendant and his wife might be admissible to impeach defendant if he testified, even though it would not be admissible if he did not. Based on *Nicholas*, the court concluded that, if defendant testified in his own defense, his statements to Verduzco could be admitted. Because of the ruling, defendant elected not to testify. His lawyer made it clear to the court that, but for the change in ruling on the impeachment issue, defendant would have testified again at the second trial. The court accepted the representation and assured counsel "[y]our issue is preserved."

A. testified defendant had lived with her and her mother for as long as she could remember. The first incident of sexualized conduct between A. and defendant took place when she was approximately 10 years old. She was sitting beside him on the couch, and she reached over and touched his penis over his clothes. She did not know why she did so. Defendant responded by putting his hand on her chest and touching her over her clothes. Over the next couple of years, other things happened, but she had limited recollection of specifics.

A. did remember an incident that took place when she was approximately 12 years old. She sat on defendant's lap, and he was touching her over her clothes. She turned toward him and he began kissing her on the lips. She stated it "freaked" her out. During this same incident, defendant also touched her vagina and her breasts. She

5

disclosed the incident to a friend, but mentioned only the kiss. She told her friend it might have been an accident.

A.'s friend, in turn, told A.'s mother about the reported kiss, and the mother confronted defendant. In the upheaval that followed, A. decided to downplay the incident and described it as probably just an accident. Thereafter, defendant apologized to A. privately and assured her it would not happen again.

Defendant complied with that assurance for a few months. Thereafter, when A. was 13 years old, defendant began touching her again, and escalated to putting his mouth on her vagina. This occurred with increasing frequency, from a few times per month, to a few times per week, and then to perhaps every day. A. also touched defendant's bare penis, and he touched her bare breasts. A. testified that in one instance, defendant came into the room where she was watching television and started touching her. She took off her shorts and he took his penis out of his pants. She put her hand on his penis and rubbed it. He orally copulated her.

A. testified she felt dirty when defendant touched her or kissed her, but she also liked the attention, and believed that, allowing him to do these things was a way to get him to say "yes" to things she wanted.

The abuse came to light in December 2009, when A. burst into tears in front of some friends, after defendant had driven them home from a soccer game. When another of A.'s friends asked A. whether defendant had hit her or touched her, A. told her of the sexual abuse. A.'s friends advised her she needed to leave the house, so they all went to the neighbor's house. The neighbor telephoned A.'s mother, and A. told her mother of the sexual abuse.

Defendant learned of A.'s accusation at about the same time she had spoken with her mother. He arrived at the neighbor's house to ask A. what was the matter, and

she accused him of touching her. He denied it. Later the same day, defendant left for his brother's house in Long Beach, and expressed the intent to commit suicide.

Defendant made statements to others from which his guilt could be inferred. For example, when one friend asked him "[w]hy did you do this," he reportedly hung his head and said "I don't know." When the same friend asked him "[h]ow could you do this," he replied A. would sometimes come up to him and grind against him, and he would try to stop her.

## DISCUSSION

*1. Communications protected under the psychotherapist-patient privilege*

Defendant first argues the trial court erred by ruling that if he testified in his own defense, the prosecution could introduce privileged statements he made to Verduzco. Defendant claims this ruling improperly forced him to elect between his constitutional right to testify on his own behalf, and his right to preserve the confidentiality of his psychotherapist-patient communications.

It is well settled that "[o]n appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145; *People v. Zapien* (1993) 4 Cal.4th 929, 976.) This rule is of particular significance here, because while the trial court's reasons for concluding defendant's statements to Verduzco would be admissible for impeachment purposes if he testified were incorrect, the ultimate decision was proper.

7

*1.1 There is no general rule permitting communications protected under the psychotherapist-patient privilege to be admitted for impeachment purposes.*

In arguing that his communications with Verduzco were inadmissible at trial, defendant relied on the *statutorily created* psychotherapist-patient privilege, contained in Evidence Code section 1010, et. seq. However, neither the prosecutor's assertion that defendant would forfeit his right to exclude the communications if he testified, nor the trial court's ultimate ruling on that issue, focused on the specific claim of privilege.

Instead, the prosecutor argued defendant would waive his privilege to exclude potentially incriminating evidence under an exception to the *Miranda* exclusionary rule if he chose to testify, while the trial court adopted a federal court's analysis pertaining to a *common law* marital privilege (see *Trammel v. United States* (1980) 445 U.S. 40 [100 S.Ct. 906, 63 L.Ed.2d 186]) in ruling that defendant's testimony could be impeached with the otherwise privileged communication if he did so. But, while the *statutory* psychotherapist-patient privilege, the *Miranda* rule and the federal common law *marital privilege* all invoke the concept of a "privilege," none is governed by the same analysis under California law.

The psychotherapist–patient privilege, like the lawyer-client privilege (Evid. Code, § 954), the physician-patient privilege (Evid. Code, § 994), the marital communications privilege (Evid. Code, § 970) and the clergy–penitent privilege (Evid. Code, § 1033), are contained in the California Evidence Code to protect the *privacy* of certain confidential relationships. (See *People v. Stritzinger* (1983) 34 Cal.3d 505, 511.) By contrast, the *Miranda* rule, invoked by the prosecutor, is an "exclusionary rule" (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86) designed to protect a criminal defendant's "'full opportunity to exercise *the privilege against self-incrimination*.'" (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162 (*Lessie*).) The rule under *Miranda* is

*remedial*, designed to ensure interrogators obtain no advantage from ignoring a defendant's invocation of his constitutional right to remain silent. (*People v. Andreasen, supra*, 214 Cal.App.4th at p. 86.)

In 1971, the United States Supreme Court concluded statements obtained in violation of the *Miranda* rule would nonetheless be admissible for impeachment purposes if the defendant elected to testify in his own defense. (*Harris v. New York* (1971) 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1].) And after the California voters passed Proposition 8 in 1982, which "amended the state Constitution to limit the court's power to exclude relevant evidence from criminal proceedings" (*Lessie, supra,* 47 Cal.4th at p. 1163.), our Supreme Court held this amendment also forbade our state courts from excluding self-incriminatory statements made during custodial interrogation if defendant chose to testify. (*People v. May* (1988) 44 Cal.3d 309, 318 (*May*).) Thus, after *May*, the rule in both state and federal courts has been that statements obtained in violation of *Miranda* – what the prosecutor in this case referred to as "*Miranda*-defective" statements – though inadmissible in the prosecution's main case, are admissible for impeachment purposes if the defendant chooses to testify.

Significantly, however, the passage of Proposition 8 did nothing to change the scope of existing *statutory privileges* contained in our Evidence Code, including the psychotherapist-patient privilege defendant relied upon in this case. To the contrary, the proposition expressly states "[*n*]*othing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay . . . .*" (Cal. Const., art. I, § 28, subd. (f), par. (2), italics added.) Our Supreme Court explicitly recognized this distinction in *May*, acknowledging "the 'Truth-in-Evidence' provision of our Constitution was probably intended by the California voters as a means of (1) abrogating *judicial* decisions which had required the exclusion of relevant evidence solely to deter police misconduct in violation of a suspect's constitutional rights under the state Constitution, while (2)

9

preserving *legislatively* created rules of privilege insulating particular communications, such as the attorney-client or physician-patient privilege." (*May*, *supra*, 44 Cal.3d. at p. 318.)

And although our Supreme Court also suggested in *May* that it "seems reasonable" to stretch the U.S. Supreme Court's statement in *Harris v. New York, supra*, 401 U.S. at page 225, that a defendant's privilege to remain silent "cannot be construed to include the right to commit perjury" if he later elects to testify, into a conclusion, "that no privilege, statutory or otherwise, protected defendant from impeachment in this case" (*May*, *supra*, 44 Cal.3d. at p. 319), the suggestion was purely dicta, and unsupported by any analysis.

In fact, the scope and effect of *statutory* privileges, just like other statutory provisions, cannot be determined by simply applying judicial notions of fairness or public policy, in the same way the scope of a common-law rule, such as the *Miranda* rule, might be shaped. Instead, where our Legislature has enacted rules applicable to a category of protected communications by codifying a privilege, we are bound by its pronouncement in the same manner as we are with other statutes. (See, e.g., *Coito v. Superior Court* (2012) 54 Cal.4th 480, 488 [treating interpretation of work product privilege as ordinary matter of "statutory construction"]); *La Jolla Group II v. Bruce* (2012) 211 Cal.App.4th 461 [applying ordinary rules of statutory construction to the litigation privilege].)

And as pertains to the psychotherapist-patient privilege, the Legislature has enacted detailed rules, encompassing 19 statutes in the Evidence Code. (Evid. Code, §§ 1010–1027.) Several of these statutes set forth exceptions to the psychotherapist-patient privilege. (See, e.g., Evid. Code, §§ 1016 [patient litigant], 1018 [services sought in aid of crime or tort], 1023 [proceeding to determine sanity of defendant], 1024 [patient a danger to self or others].) Moreover, we are bound by the pronouncements of our own Supreme Court that the psychotherapist-patient privilege must be construed *broadly*, and

10

any exception to it must be construed *narrowly*. (*People v. Stritzinger, supra*, 34 Cal.3d at pp. 511-513.)

Consequently, while it would have been appropriate for the trial court to view a defendant's decision to testify as a waiver of his right to exclude evidence under the *Miranda* rule, defendant never invoked *Miranda*, and the analysis, which support admission of those communications for impeachment purposes under that rule, cannot be automatically applied to defendant's *separate statutory right* to exclude evidence under the psychotherapist-patient privilege. The trial court was correct in its initial refusal to equate the two.

But, the trial court then erred when it reversed its initial ruling in reliance on *Nicholas*, the federal district court case, which analyzed whether evidence protected by the federal common law marital privilege would be admissible to impeach a defendant if he chose to testify. The federal court, which is not bound by the California Evidence Code, was free to simply analogize the exclusion of evidence under the common law marital privilege to the exclusion of evidence protected by the *Miranda* rule, and to reason that "[t]he marital communications privilege, like all evidentiary privileges, is not absolute and is construed narrowly because '[p]rivileges obstruct the search for the truth'" (*Nicholas, supra*, 594 F.Supp.2d at pp. 1123-1124), and to then conclude use of such privileged communications for impeachment purposes might be appropriate because "[e]ven the most sacrosanct privileges must give way to the jury's obligation to find the truth in some circumstances" (*id.* at p. 1124). However, the trial court below was not free to simply employ the same analysis without considering either the specific provisions governing the scope of the psychotherapist-patient privilege under California law (Evid. Code, § 1010, et. seq.), or California courts' decisions interpreting it.

And, when we consider the statutory scheme ourselves, we can find no provision that would allow an otherwise privileged communication between a

11

psychotherapist and patient to be admitted into evidence for impeachment purposes merely because the patient elects to testify at a trial. As the prosecutor argued below, there is a statutory "patient-litigant" exception to the privilege, which allows admission of "relevant" communications between the psychotherapist and patient, when a patient (or his representative) elects to place the patient's "mental or emotional condition" in issue at trial. (Evid. Code, § 1016; *In re Lifschutz* (1970) 2 Cal.3d 415, 421.) But defendant was not seeking to do this here.

Nevertheless, as we explain below, the court's decision to admit the evidence was appropriate because defendant's statements were exempt from the psychotherapist-patient privilege in the first instance.

1.2 *Defendant's statements to Verduzco were not covered by the psychotherapist-patient privilege.*

Generally, a patient's communications with a psychotherapist are privileged, and the patient may refuse to disclose them and can prevent others from doing so. (Evid. Code, § 1010, et seq.) The privilege covers not only communications made exclusively to the psychotherapist, but also those communications disclosed to third parties who, as far as the patient is aware, are present to further the interest of the patient in the consultation. (Evid. Code, § 1012.)

But one of the exceptions to the psychotherapist-patient privilege involves "mandated" reports of child sexual abuse pursuant to the Child Abuse and Neglect Reporting Act. (§ 11164, et seq; CANRA.) CANRA requires certain "mandated reporters," including psychiatrists and nurses, to report instances of suspected child abuse, including child sexual abuse, to authorities. Section 11164 provides, with two exceptions not relevant here, "a mandated reporter shall make a report to an agency specified in Section 11165.9 *whenever the mandated reporter, in his or her professional*

12

*capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect.*  The mandated reporter shall make an initial report by telephone to the agency immediately or as soon as is practicably possible, and shall prepare and send, fax, or electronically transmit a written follow up report within 36 hours of receiving the information concerning the incident."  (Italics added.)  Information reported to authorities pursuant to CANRA by physicians or psychotherapists is *expressly exempted* from the physician-patient or psychotherapist-patient privilege for purposes of "any court proceeding or administrative hearing."  (§ 11171.2, subd. (b).)

Defendant argues that, notwithstanding this exemption, his statements to Verduzco remained privileged because at the time he spoke with her, his alleged abuse of A. had already been reported to the police in Cypress – and thus Verduzco had been relieved of any obligation to report the same abuse under CANRA.  Defendant bases this argument on *People v. Stritzinger, supra*, 34 Cal.3d 505 (*Stritzinger*), in which our Supreme Court concluded that, a psychotherapist, who had already reported potential child sexual abuse to the police, had no obligation to report the abuse a second time, based on the defendant's subsequent revelation of *the same information*.  Thus, the *Stritzinger* defendant's own statements to the therapist fell outside of CANRA's reporting requirements and remained privileged.

This case is distinguishable.  In *Stritzinger*, the Supreme Court merely concluded that, once a psychotherapist had reported an incident of suspected child abuse in accordance with CANRA, he was not required to report the *same* details of the *same* abuse again.  But the Supreme Court made clear that if the therapist "had *first learned* of the fondling incidents from defendant himself, he would have been bound to report that information as provided in the act."  (*Stritzinger, supra,* 34 Cal.3d at p. 513, italics added.)  This is what happened here.  Verduzco, a mandated reporter, first learned of

13

defendant's abuse of A. from defendant himself. Moreover, *Stritzinger* also states if the therapist had "learned from defendant of possible further child abuse — whether additional incidents involving Sarah, or other incidents with another child — he would, of course, have been required to report these new suspicions." (*Ibid.*) And of course, if the therapist had not made the first report himself, he would have no idea whether the incidents he learned of from the patient were the *same incidents* which may have already been reported by someone else — even if he did have reason to believe someone else might have already made a report. Thus, *Stritzinger* does nothing to relieve a therapist from the initial obligation to report under CANRA.

And because the information reported to authorities pursuant to CANRA is *expressly exempted* from the psychotherapist-patient privilege for purposes of "any court proceeding or administrative hearing" (§ 11171.2, subd. (b)), the information in Verduzco's report was not covered by that privilege.

Therefore, the trial court did not err by ruling that, if defendant chose to testify, the prosecutor could introduce the statements he made to Verduzco for impeachment purposes. Because the statements Verduzco reported to DCFS were excluded from the psychotherapist-patient privilege in the first instance, the privilege would not have prevented the statements from being introduced into evidence.

*2. Any Error in the Jury Instructions was Harmless.*

Defendant also contends his conviction must be overturned because the trial court improperly relied on CALCRIM Nos. 1110 ("Lewd or Lascivious Act: Child under 14 years (Pen. Code, § 288(a))") and 1120 ("Continuous Sexual Abuse (Pen. Code, § 288.5(a))") in its instructions to the jury. Defendant argues these form instructions are flawed because while both specify the improper touching of the child must be done by

14

the defendant "willfully" and "with the intent of arousing, appealing to or gratifying the lust, passions or sexual desires of [himself] or the child" (CALCRIM No. 1110; CALCRIM No. 1120 [same effect]), they both also state the touching "need not be done in a lewd or sexual manner."

According to defendant, the problem with these instructions is that they omit one required element of the charged crimes; i.e., that the defendant "willfully *and lewdly*" commits a "lewd and lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." (§ 288, subd.(a), italics added.) Defendant points out that, while one court has already rejected this argument (*People v. Sigala* (2011) 191 Cal.App.4th 695, 700 (*Sigala*) [finding that "[r]ead as a whole" this part of the instruction is consistent with the Supreme Court's earlier holding lewdness is inherent in the requirement that "'the touching must be accompanied by the intent for 'sexual gratification'"]), another court explicitly questioned this conclusion. In *People v. Cuellar* (2012) 208 Cal.App.4th 1067, 1071 (*Cuellar*), the court pointed out that, while "[i]t may be that, 'read as a whole' the sentence does no harm, . . . we think that is subject to question. It certainly does no good." (*Id.* at p. 1071.)

But the *Cuellar* court does not actually disagree with *Sigala.* Instead, the opinion merely "urge[s] that the Judicial Council's Advisory Committee on Criminal Jury Instructions reconsider the language of this sentence and propose new language that simply states that the touching need not be made to an intimate part of the victim's body, so long as it is done with the required intent. If that revision is made, the two sentences would complement each other and any *arguable* inconsistency would be removed." (*Cuellar, supra,* 208 Cal.App.4th at pp. 1071-1072, italics added.)

15

*Cuellar* ultimately finds it unnecessary to resolve the arguable inconsistency, because it concludes that, in light of the evidence presented, the instructions, taken as a whole, would not have confused the jury. The court noted "virtually all of the touching described in the testimony was sexual, rather than incidental, in nature." The same is true here as well. Although defendant argues there were incidents of innocuous, or incidental, touching described in the testimony, and suggests the jury might have been focusing on those incidents when it voted to convict, the argument is not persuasive. The incidents defendant relies upon include (1) the testimony of a third party, who related A. had originally told him defendant had once "inadvertently" kissed her when both were reaching for the television remote control, and (2) the testimony of a different third party, who related defendant had described incidents where A. would sit on his lap and "grind him" and he would "push her off."

But neither of those incidents of innocuous touching could have been the basis for defendant's conviction. As for the "inadvertent" kiss while reaching for the remote, A. acknowledged that, while she had once *described* the incident as such, because she initially wanted to avoid getting either defendant or herself into trouble, in reality the kiss had been quite intentional on defendant's part. It freaked her out. Moreover, if the jury had nonetheless believed the kiss had actually been inadvertent, it could not have relied on this incident as the basis of a conviction. Whether or not the jury understood the alleged touching was required to be distinctly "lewd," there was no question they were clearly instructed it was required to be "willful[]." We presume the jury complied with this very clear aspect of the instructions, and thus it would not have convicted based on an "inadvertent" kiss. "[T]he jury is presumed to follow the trial court's instructions." (*People v. Fuiava* (2012) 53 Cal.4th 622, 669; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1336.)

16

The supposed incidents of "grinding" are similarly insufficient as a basis for conviction. According to what was described, A. was the aggressor in these incidents, and defendant pushed her off his lap when she began acting inappropriately. Thus, these incidents include neither "willfulness" on defendant's part, nor reflect *he* had any "intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [himself] or the child." (CALCRIM No. 1110.)

Finally, the fact the jury expressly found true defendant had engaged in "masturbation" with A. belies the notion the jury might have actually believed his touching of her was somehow innocuous. Based on the evidence as well as the jury's verdict, we find no basis for concluding the jury might have been misled into convicting defendant of the charged crimes based on incidents of innocuous or incidental touching.

DISPOSITION

The judgment is affirmed.

**CERTIFIED FOR PUBLICATION**

RYLAARSDAM, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

17