Filed 8/25/21  P. v. Diaz CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE, | C089714 |
| Plaintiff and Respondent, | (Super. Ct. No. F17-000446A) |
| v. | |
| MICHAEL BRENNER DIAZ, | |
| Defendant and Appellant. | |

A jury found defendant Michael Brenner Diaz guilty of home invasion robbery (Pen. Code, § 211)[1] and first degree residential burglary (§§ 459, 460, subd. (a)).  The jury found true that defendant committed the robbery in concert with two others (§ 213, subd. (a)(1)(A)).  Defendant waived jury trial on allegations that he was previously convicted of a serious felony in Colorado (§ 667, subd. (a)), and that the prior conviction constituted a strike under California's three strikes law (§§ 1170.12, subds. (a)-(d), 667,

[1]  All undesignated statutory references are to the Penal Code.

1

subds. (b)-(i)).  After a bench trial, the court found the prior conviction to be true.  The court sentenced defendant to the midterm of six years on the robbery count, doubled to 12 years for the strike prior, plus five years for the serious felony, for a total sentence term of 17 years in state prison.  The court imposed and stayed under section 654 a total sentence of 13 years on the burglary count, consisting of the midterm of four years, doubled to eight years for the strike, plus five years for the prior serious felony.

Defendant contends the trial court abused its discretion in excluding impeachment evidence under Evidence Code section 352 that (1) Benjamin Kennedy, a key witness who was living at the home at the time of the crime, had a pending charge for misdemeanor sexual battery and (2) Dr. Micah Berry, who owned the home, had remarked to a neighbor that Berry was growing marijuana there to evade taxes.  Defendant further argues that excluding this impeachment evidence was cumulative error requiring reversal.

Beyond claims of evidentiary error, defendant maintains that the court abused its discretion in declining to dismiss the prior strike, a 30-year-old conviction for second degree murder in Colorado (§ 1385, subd. (a)).  Additionally, defendant seeks remand to the trial court to exercise its discretion to strike the five-year enhancement for the prior conviction, arguing that the court was not aware that it had discretion to do so as a result of Senate Bill No. 1393 (2017-2018 Reg. Sess.).  Finally, defendant claims the Colorado conviction did not qualify as a serious or violent offense under the three strikes law.

We will affirm the judgment.

**FACTUAL BACKGROUND**

A.     *Prosecution's Case*

Berry owned a house on Grizzly Trail in Grass Valley.  The house was a log cabin, the last house at the end of a long dirt road.  The nearest neighbor, Joe Alietti, was 150 yards away.  Berry lived at the house off and on.

Berry's cousin, defendant, lived at the house from July 2017 to early October 2017. Berry had flown defendant up from Austin, Texas. In October 2017, Berry bought defendant a plane ticket back to Austin. Berry asked defendant to leave.

Defendant left personal property behind in the house, including barbering tools and artwork. In September 2017, Berry had a brief conversation with defendant about bringing defendant's tools down to Los Angeles so he could retrieve them.

Berry had a gun safe at the house. He kept guns, gun parts, cash and important personal documents in the safe. Berry had high-capacity magazines in the safe but did not know it was a felony to possess them in California. Berry showed defendant what was in the safe. Nothing in the safe belonged to defendant.

When defendant was living at the house, there were marijuana plants growing outside. The plants belonged to Berry's father. Berry was aware of the marijuana plants, but he did not know how to grow marijuana or how many plants were there. He did not smoke or sell marijuana. Berry had tractor work done to make room for the plants. Berry also paid his neighbor Alietti to grow marijuana plants on his property.

In December 2017, Kennedy was living at the house. Kennedy was the caretaker of the property. He also took care of Berry's dog. Kennedy was staying there for free in December 2017, but this arrangement transitioned to a rental agreement where Kennedy paid $2,500 monthly rent.

Kennedy did not take care of the marijuana. In December 2017, a person named Denny did daily maintenance of the marijuana plants and Berry paid him. During the summer of 2017, defendant and a couple others were taking care of the plants. Denny, defendant and others helped plant the marijuana plants. In December 2017, the marijuana had been harvested. Approximately 15 to 20 pounds of marijuana were in bags in the basement or drying.

Kennedy testified at trial under use immunity. On December 11, 2017, Kennedy had been living at Berry's residence for less than a month. Denny and Chris O'Toole

3

were also staying there from time to time. Kennedy was staying on the property in exchange for taking care of the dog and doing landscaping and general maintenance. There was marijuana in the basement. It belonged to Berry. Kennedy had nothing to do with the marijuana.

On December 11, 2017, Kennedy was awakened at 1:00 or 2:00 in the morning by the dog barking. He went to the sliding door on the side of the house, which was the main entrance on the second story. There were two men standing in the driveway. Kennedy did not recognize them. They said their truck had run out of gas. Kennedy told them he didn't have any gas.

Kennedy went inside, rolled a joint, and laid down on the couch. As soon as he did, the dog started barking again. He opened the sliding door and saw the two men again. Defendant came up the stairs yelling at Kennedy. Defendant grabbed Kennedy and threw him on the ground. Kennedy's hands were tied behind his back. He noticed that one of the other men had a bat and the other a machete. The men got on top of him and started yelling about the gas. They dragged him to the garage where the gas cans were, which were all empty, and then dragged him back into the house. They sat him down in a chair and asked if anyone else was in the house. Kennedy said there was no one else there. They proceeded to ransack the house.

The dog was trying to bite the men and they were threatening the dog. Eventually, the men allowed Kennedy to have his hands in front to keep the dog calm. At first, the men took turns standing over him so he wouldn't run. They were telling Kennedy not to look at them. Defendant tried to keep his face covered with black fabric.

Defendant went straight for the safe. He was drilling into it. The men could not get into the safe and loaded it in their truck. The truck was stuck in the mud, pretty far from the house. The men made Kennedy carry things down to the truck. They were taking electronics and random things. Kennedy saw defendant make trips to the truck.

4

One of the men took $5,000 that Kennedy had in the basement; the money was to buy a car the next day. Kennedy said it was every cent he had and asked them not to rob him. Defendant told the man who took the money to give it back to Kennedy.

Kennedy testified defendant seemed to be the ringleader. He appeared to be calling the shots. But Kennedy also testified that each man seemed to have his own opinion about how things should be done and what was a priority to take or not take. They were all trying to be the boss and were butting heads.

When Kennedy, defendant and the dog were headed back to the house after a trip to the truck, the dog was trying to bite defendant. Kennedy had untied his hands and was holding them as if they were tied. Defendant grabbed some food to lure the dog into the back room. Kennedy threw a television in front of the kitchen door and ran to Alietti's house. It was getting light. When Kennedy heard the truck engine turn over, he slammed a rock on Alietti's window, hopped the fence, and knocked on the door. Alietti answered the door, let Kennedy in, and called the police. Kennedy talked to the 911 dispatcher. The police arrived in 45 minutes. Kennedy heard an officer pull up and say, "Stop. Get on the ground."

Shortly after December 11, 2017, law enforcement officers contacted Berry. He went out to the house to assess the damage. The house looked ransacked. Some of his valuables were gone. Things were strewn about. Telephone and internet wiring had been ripped out of the wall. Berry's dog had been locked out of a sliding glass door on the main floor and was pawing to get in. Some of defendant's property, as well as Berry's, was in the master bedroom. There was a small wooden bat at the house that did not belong to Berry.

Towards the end of December 2017, Berry and Kennedy went to the sheriff's property unit to point out what property belonged to Berry and what did not. Berry saw a four-door truck packed full of stuff, including multiple cell phones and computers. Some things like small tools and clothing were Berry's property. Laid out by the truck were

bags of marijuana, tools, luggage, and some valuable items that were Berry's. The sheriff released the marijuana to Berry, who provided a marijuana recommendation for his father.

On December 11, 2017, a detective with the Nevada County Sheriff's Office arrived at Grizzly Trail at about 7:15 a.m. Two officers were already there by a truck off the side of the road 200 yards from the house. The truck was stuck against some trees and could not move under its own power. Alietti came out of his house and told the detective that Kennedy was with him. The detective entered Berry's house with two other officers to do a protective sweep. The house appeared ransacked. After the protective sweep, the detective interviewed Kennedy for 20 to 30 minutes and also spoke to Alietti. A couple hours later the detective retrieved the wire Kennedy was tied up with from Alietti's house.

At about 10:00 a.m. on December 11, 2017, Kennedy was riding with a sergeant back to the sheriff's office when they heard over the radio that a suspect had been detained. They drove to that location and Kennedy said he was 95 percent certain the man detained, who turned out to be Shawn Turnage, was one of the robbers.

Kennedy and the sergeant were headed towards Nevada City when they heard reports that a third suspect was seen running in and out of bushes. The sergeant told Kennedy to keep an eye out as they drove. The sergeant saw defendant coming out of a driveway and Kennedy blurted out that he was another of the men involved. The sergeant handcuffed defendant. Just under $3,000 in cash was found on defendant.

The Nevada County Sheriff's Office detective also interviewed defendant after he was booked into jail on December 11, 2017. Defendant said Berry was his cousin and defendant had lived at the property for approximately one year. Defendant said he helped Berry with odd jobs around the property. Defendant told the detective he knew the two other individuals apprehended that day. He identified them as Shawn and Steve and said

6

he had known them about a month. The detective later learned their full names, Shawn Turnage and Steve Rhodes.

Defendant recounted that he and his two friends, Shawn and Steve, decided to drive from Texas to the property. Defendant initially said it was to visit his cousin, Berry. They drove in Turnage's black Ford F-150 and got in at 2:00 a.m. The trip took four days. Defendant was not sure whether Berry would be at the property or not. Defendant said when they arrived at the property, they were looking for gas. Later in the interview, defendant said they were going to get a pound of marijuana. Subsequently, defendant confirmed to the detective that defendant came to California to "rip off" five to 10 pounds of marijuana from his cousin.

Defendant said that the three men met Kennedy at the house on the deck in front of the sliding door. Defendant admitted he knocked Kennedy down on the deck. Defendant thought Kennedy was someone named Chris O'Toole. Defendant said he was unaware that Kennedy was tied up, but if he was, one of the three must have done it.

When they went in the house, defendant said that Turnage and Rhodes were trying to get into a gun safe. They had a disagreement about taking Berry's personal items. Defendant just wanted the marijuana. He took two black garbage bags of marijuana to the truck. After defendant took the marijuana to the truck, Turnage and Rhodes started ransacking the house. Defendant denied knowing how the safe got into the truck.

The detective found roughly 15 pounds of marijuana in the truck. The marijuana was bagged in a variety of ways, some in smaller bags, some in larger bags and some not bagged at all. Based on review of aerial photographs, the detective estimated that 75 plants were grown at the property.

Defendant maintained that, after Kennedy was brought in the house, he was free to walk anywhere, but defendant acknowledged that the three men would have resisted Kennedy trying to leave. Kennedy told defendant the other two had taken his money and he wanted it back. Defendant said he got the money back and gave it to Kennedy.

7

Defendant told the detective he attempted to cover his face because he didn't want his cousin to see him. But defendant also said if his cousin were there, he would have given defendant the marijuana and a place to sleep. Defendant acknowledged that he was the reason Turnage and Rhodes were there.

Defendant told the detective he was near the truck when law enforcement arrived. Turnage started to run, so defendant did as well. Also, he ran because marijuana was in the truck and he was high.

On January 29, 2018, defendant left a voicemail message for Berry saying defendant loved Berry, he was sorry for what happened, and congratulating Berry on his engagement.

B.    *Defense Case*

On December 11, 2017, Corlene and Richard Mapes were living on Grizzly Trail.[2] At 6:15 a.m., Corlene heard a lot of cursing outside. She also heard spinning tires from the same location. At about 6:30 a.m., a man knocked on the door. Richard answered the door. The man said he ran out of gas and needed some. The man offered money but Richard did not take it. Richard gave the man gas and he put it in his truck. The truck was a black Ford F-150 that was off the road and stuck against some saplings.

There were three individuals with the truck, one was defendant. The man who asked for gas then asked for a shovel, but Richard refused to give it to him. Richard also refused a request for a chain saw. The man did not return the gas can and Richard came up to the truck to get it. Richard shook hands with two of the men. Corlene was ready to call 911 but did not because she assumed the men were some of the people going up to tend the marijuana garden.

---

[2] Because they share a last name, we refer to Corlene and Richard Mapes by their first names with no lack of respect or informality intended.

Berry bought the property in spring of 2016 and started growing marijuana that summer. In summer 2017, when Berry started a new grow, he brought a bulldozer out to the property and terraced the wrong property. In early summer 2017, Berry had between 70 and 100 plants growing on the property.

In December 2017, pursuant to a search warrant, a Nevada County sheriff's deputy searched and photographed the truck found at the scene and brought it to the sheriff's property unit. A safe was removed from the truck and a locksmith opened the safe. There was cash in the safe in the amount of $9,208. A black duffle bag that came from the residence contained a scale. No one claimed the scale. Bags of various sizes and types of processed (i.e., with seeds and stems trimmed off) and unprocessed marijuana were removed from the truck.

On December 4, 2018, a Citrus Heights police officer talked to Kennedy, asking if he remembered being at a Family Fitness gym earlier that day. Kennedy initially denied that he had been there. The officer showed Kennedy a guest form from the gym with his full name and date of birth and Kennedy admitted being at there earlier that day.

The detective testified that when Kennedy was interviewed, he did not tell the detective that defendant grabbed his collar from the back; Kennedy said defendant came up from behind and knocked him down. Kennedy said that his hands were moved to the front so he could smoke a cigarette. He did not say he tried to protect the dog from being threatened. Kennedy also told the detective he heard Alietti talking to his dogs prior to trying to escape, not that he tried to wake Alietti up. Kennedy said he had $7,000 in a drawer in the house and another $2,400 to $2,600 in his wallet. Kennedy said someone had tried to drill through the gas tank of a vehicle, but the detective did not observe any damage to that vehicle. The detective counted 97 to 99 marijuana plants at Berry's property.

9

## DISCUSSION

### I.     Exclusion of Impeachment Evidence

Defendant contends that the trial court erred in excluding impeachment evidence under Evidence Code section 352 that:  (1) Kennedy had been charged with sexual battery, "mistakenly believing that because it was not a conviction yet that it was to be excluded"; and (2) Berry "told his neighbors he was in the marijuana business to evade taxes."[3]  Defendant further contends that "[t]he combination of these errors allowed the People to shake off the accusation that this case was one of a drug deal gone bad followed by theft."  We conclude there was no error, separately or cumulatively.

### A.     Procedural Background

#### 1.     Misdemeanor Sexual Battery Charge

On February 13, 2019, defense counsel told the trial judge that he had learned that Kennedy, "the central witness to the prosecution's case," had two pending criminal cases against him in Sacramento involving driving under the influence (DUI) and sexual battery (§ 243.4, subd. (e)(1)).  Counsel contended that sexual battery was a crime of moral turpitude admissible to impeach Kennedy and that the prosecution had delayed in providing information of these charges.  The defense requested that Kennedy be excluded from testifying.  The prosecutor responded that she had learned of these misdemeanor charges recently and that she was not aware of authority that misdemeanor sexual battery was a crime of moral turpitude.

---

[3] Defendant also contends the trial court excluded impeachment evidence that Berry "had illegally imported a high capacity gun magazine into the State of California." Defendant's briefs do not provide any authority or analysis to explain how the trial court erred in excluding such evidence.  "When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary.  [Citations.]" (*Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700; *People v. Banda* (2018) 26 Cal.App.5th 349, 361-362.)

10

The court found that there was no issue of late disclosure and denied the request to exclude Kennedy as a witness. The court took under advisement whether misdemeanor sexual battery qualified for impeachment. Defense counsel agreed with the court's observation that a DUI did not qualify. The court inquired of defense counsel whether there was authority for impeachment with a crime of moral turpitude prior to conviction and defense counsel responded that he did not have a definitive answer on that question. The court made a "preliminary determination" that a witness could not be impeached with a crime prior to conviction but stated that it would do additional research and rule later. The court directed the prosecution to obtain a copy of the police report regarding the sexual battery charge.

The court took up the issue later that day, reiterating its preliminary determination that an arrest for sexual battery is not a crime of moral turpitude. Additionally, the court stated it would be inclined to exclude evidence of Kennedy's alleged conduct under Evidence Code section 352. The court reserved its ruling but stated that, considering Evidence Code section 352, "the end result" would not change.

Defense counsel suggested that the police report might indicate that Kennedy lied to the police. The court responded "[t]hat's a different charge entirely." The court concluded, "I remain open and I am still directing the People to exercise all attempts to get that documentation."

In the course of the trial, defense counsel informed the court the prosecution had provided the police report identifying the complainant in the sexual battery charge, a female gym employee, and stating that Kennedy had groped the employee when she was showing him around and was asked to leave twice before he left.[4] The report also stated

---

[4] Defense counsel read the police report to the trial court. The report described Kennedy's initial denial that he was at the gym earlier that day and included his denial that he had touched the victim's breasts.

that, in the course of the DUI investigation, a police officer interviewed Kennedy about the gym incident and he denied that he was present at the gym until shown a signed membership application form.

Defense counsel contended Kennedy could properly be impeached with the sexual battery charge and for lying to the police. The prosecutor agreed that lying to police was a proper subject for impeachment. The prosecutor argued, however, that the misdemeanor sexual battery was a "fresh allegation" and research did not indicate it was a crime of moral turpitude. The trial court agreed that "this is not a conviction" and "we are not going to have a trial within a trial" of Kennedy's misdemeanor sexual battery charge. The court stated its willingness to reconsider if shown applicable authority.

The court then ruled that it would preclude evidence of Kennedy's touching the victim and the charge of misdemeanor sexual battery.

At the next appearance of counsel, the prosecutor informed the trial court that she had found case authority that sexual battery is a crime of moral turpitude. The court confirmed with the prosecutor that the case involved a conviction and commented, "That has been my whole distinction. If we don't have a conviction . . . ."

Thereafter, the trial court conducted an Evidence Code section 402 hearing where the Citrus Heights police officer who interviewed Kennedy testified. The court ruled that the officer could testify regarding Kennedy's denial that he had been at the gym. The officer testified accordingly to the jury.

### 2. Growing Marijuana to Evade Taxes

In cross-examining Berry, defense counsel asked, "Have you ever told any of your neighbors the reason you grow marijuana is to avoid paying taxes." The court sustained the prosecutor's objection to the question. In chambers, defense counsel stated that Richard Mapes would testify that Berry made this statement. The prosecutor argued that "we're getting into more issues of trying to catch this witness in either lies or particular crimes he may or may not be aware of and I think that it's just taking us down along a

12

[Evidence Code section] 352 road." Defense counsel responded the question was "directly relevant to the witness's character for truthfulness."

The court ruled that the probative value of the evidence was outweighed by its undue prejudicial effect. The court acknowledged that "credibility is an issue for this particular witness" but "a mere statement to somebody does not make it so." The court reasoned that this subject "is quite far afield of the underlying allegations in this particular case" and the prejudicial effect of the witness "running the risk of a 5th Amendment [issue] relative to something totally unrelated to this particular case" outweighed the probative value of the evidence.

## B.     Legal Standards

Evidence a witness has been charged with misconduct involving moral turpitude is admissible to impeach his or her credibility. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295 (*Wheeler*); *People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24 (*Contreras*).) "Misconduct involving moral turpitude may suggest a willingness to lie [citations], and this inference is not limited to conduct which resulted in a felony conviction." (*Wheeler, supra*, at pp. 295-296.)

Sexual battery is a crime of moral turpitude. (*People v. Chavez* (2000) 84 Cal.App.4th 25, 30.)

Whether the statement attributed to Berry that he was growing marijuana to evade taxes involves a crime of moral turpitude depends on the facts and circumstances of his behavior. Defendant cites *Golde v. Fox* (1979) 98 Cal.App.3d 167 (*Golde*), where the court quoted *In re Higbie* (1972) 6 Cal.3d 562 (*Higbie*) that " '[t]he purposeful evasion of federal laws that require the reporting and taxation of imported marijuana constitutes a fraud upon the government, an act of dishonesty no more tolerable than fraud upon an individual.' " (*Golde, supra*, at p. 182; *Higbie, supra*, at p. 572.) However, in *Higbie*, the California Supreme Court concluded that it could not hold that violation of a statute requiring payment of a marijuana transfer tax "constitutes moral turpitude in every case."

13

(*Higbie, supra*, at p. 571.)  The court noted the statute did not require an intent to defraud and "without such intent the failure to pay a tax does not involve moral turpitude."  (*Id.* at p. 571, citing *In re Hallinan* (1954) 43 Cal.2d 243, 252-254.)  Since a conviction for violation of the statute did not "constitute moral turpitude per se," it was necessary to examine the facts and circumstances of the individual's behavior to determine whether moral turpitude was involved.  (*Higbie, supra*, at p. 572.)

"A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'  [Citation.]"  (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)  "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion.  [Citations.]"  (*People v. Clark* (2011) 52 Cal.4th 856, 932 (*Clark*).)  "In most instances the appellate courts will uphold the exercise of discretion even if another court might have ruled otherwise.  [Citation.]"  (*People v. Feaster* (2002) 102 Cal.App.4th 1084, 1092 (*Feaster*).)

Further, "[t]he admission of past misconduct involving moral turpitude to impeach a witness in a criminal trial is subject to the trial court's discretion under Evidence Code section 352."[5]  (*Feaster, supra*, 102 Cal.App.4th at pp. 1091-1092.)  "[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.  The statute empowers courts to prevent criminal trials from degenerating

---

[5]  Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

14

into nitpicking wars of attrition over collateral credibility issues." (*Wheeler, supra,* 4 Cal.4th at p. 296.)

"When exercising its discretion under Evidence Code section 352, a court must always take into account, as applicable, those factors traditionally deemed pertinent in this area. [Citations.] But additional considerations may apply when evidence other than felony convictions is offered for impeachment. In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler, supra*, 4 Cal.4th at pp. 296-297; *id.* at p. 297, fn. 7 ["These acts might not even constitute criminal offenses. Under such circumstances, fairness, efficiency, and moral turpitude become more complicated issues"].)

### C.   Analysis

#### 1.   Exclusion of Evidence of Misdemeanor Sexual Battery Charge

We find no abuse of discretion in excluding evidence of the misdemeanor sexual battery charge. " '[C]onvictions which are assaultive in nature do not weigh as heavily in the balance favoring admissibility as those convictions which are based on dishonesty or some other lack of integrity.' " (*People v. Castro* (1985) 38 Cal.3d 301, 315.) Here, the evidence involved a charge of misdemeanor assault that occurred more than a year after the robbery. (*Wheeler, supra*, 4 Cal.4th at pp. 296-297; *People v. Clark, supra*, 52 Cal.4th at pp. 931-932.) Kennedy denied the charge. This is the type of attenuated evidence of misconduct that can cause the proceedings to devolve into a mini-trial over credibility. Witnesses would have to be called to testify regarding the circumstances surrounding the charge, resulting in a significant danger of undue consumption of time

15

and confusion of the issues that substantially outweighed the marginal probative value of impeaching Kennedy with a charge that did not reflect strongly on his honesty. (*Feaster, supra*, 102 Cal.App.4th at p. 1094.)

It makes no difference that the trial court may have exercised its discretion under the misapprehension that the evidence was not admissible without conviction. We are mindful that " ' "a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 976; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145; *People v. Cannata* (2015) 233 Cal.App.4th 1113, 1120 (*Cannata*).) It was an appropriate exercise of discretion under Evidence Code section 352 to exclude evidence of a misdemeanor charge, which carries less probative value than a felony conviction and "entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present." (*Wheeler, supra*, 4 Cal.4th at p. 296; *Contreras, supra*, 58 Cal.4th at p. 157, fn. 24.)

### 2. Exclusion of Remark About Growing Marijuana to Evade Taxes

We conclude that evidence that Berry remarked to a neighbor that he grew marijuana to evade taxes was even more appropriately excluded under Evidence Code section 352. There was no suggestion of any pending or even potential charge of tax evasion, let alone a conviction of a crime of moral turpitude. If Berry's conduct did not evince moral turpitude, the evidence was wholly irrelevant. (*People v. Clark, supra*, 52 Cal.4th at p. 931 [uncharged misconduct not involving moral turpitude is irrelevant for purposes of impeachment].) As the trial court observed, if Berry made this statement, that does not mean he engaged in tax evasion.

"Whether the trial court admits evidence of past misconduct should be determined solely on the basis that that conduct evinces moral turpitude." (*People v. Lepolo* (1997)

16

55 Cal.App.4th 85, 89-90.)  To determine if Berry's conduct evinced moral turpitude, the court would need to examine all the facts and circumstances of Berry's behavior to ascertain if his intention was to evade taxes and defraud the government.  (*Higbie, supra*, 6 Cal.3d at p. 572.)  A single remark is not sufficient to establish that Berry's conduct involved moral turpitude.  (*Ibid.*)  If this evidence were admitted, a mini-trial would result where additional evidence would need to be presented to make this determination. The probative value of this evidence was minimal, if it was relevant at all.  The trial court properly exercised its discretion to exclude this evidence.

### 3. Cumulative Error

Since we find no error in the court's exclusion of this evidence, we find no cumulative error.  (*People v. Mireles* (2018) 21 Cal.App.5th 237, 249.)  Further, since we conclude the trial court properly exercised its discretion under Evidence Code section 352, we reject defendant's contention that exclusion of the evidence "violat[ed] his rights under the state and federal constitutions to confront witnesses against him and to present a defense."  "There was no error under state law, and we have long observed, that, '[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense.'  [Citations.]" (*People v. Robinson* (2005) 37 Cal.4th 592, 626-627.)

If there were any error in excluding the evidence, it was harmless under any standard.  (*Feaster, supra*, 102 Cal.App.4th at p. 1094.)  Defendant did not lack for impeachment under the evidence admitted.  The trial court allowed impeachment evidence of uncharged conduct that Kennedy had lied to a police officer.  Kennedy also impeached himself with the contradictions in his statements to law enforcement that defense counsel adduced from the detective who interviewed him.  (*Ibid.*)  Berry was impeached by the extensive evidence supporting defendant's claim that Berry grew marijuana for sale.  (See *Rice v. Alcoholic Beverage etc. Appeals Bd.* (1979) 89 Cal.App.3d 30, 38 [conviction of possessing marijuana for sale constitutes moral

turpitude per se]; accord *People v. Gabriel* (2012) 206 Cal.App.4th 450, 458-459.) In closing argument, defense counsel told the jury: "[Berry] testified to you the first week of trial that he grows 20 plants for his dad. He has a hundred plants out there. He is a criminal. I won't spend a great deal of time about whether he is credible or not. That speaks for itself. You should consider giving no weight whatsoever to his testimony."

In addition, Kennedy's testimony was hardly the only evidence of defendant's culpability. Among other things, defendant admitted to the same detective that interviewed Kennedy that defendant had driven from Texas with Turnage and Rhodes to steal marijuana from Berry. The interview was defendant's opportunity to explain that he and his confederates came to complete a marijuana transaction but the deal went wrong, the defense theory at trial.[6] Instead, defendant told the detective first that he came to visit Berry, then defendant said he came to get a pound of marijuana, and then he admitted he came to steal five to 10 pounds of marijuana from Berry. Defendant admitted he threw Kennedy to the ground when they arrived and loaded bags of marijuana in the truck. Defendant was apprehended after he and Turnage fled from the truck when police arrived. (*Feaster, supra*, 102 Cal.App.4th at p. 1094.) Defendant apologized to Berry in a voicemail message. (*Ibid.*) The evidence supporting the charges on which Kennedy was convicted was overwhelming

Defendant's argument that excluding impeachment evidence resulted in a miscarriage of justice is without merit.

---

[6] In closing, defense counsel asked the jury, "Is this case really about a marijuana transaction gone wrong?" Counsel argued "can you see a plausible scenario where indeed three individuals came to the house that night and they have -- there was a discussion between the people involved and things didn't go as planned and ultimately Mr. Kennedy felt the need to summon assistance because things had gone beyond his control?"

18

## II.    Penal Code section 1385

Defendant contends that the trial court erred in declining to strike a prior conviction in Colorado for kidnapping and second degree murder under section 1385, which, under the three strikes law, doubled the midterm sentence of six years on the robbery count to 12 years.  Section 1385 provides in relevant part that "[t]he judge or magistrate may . . . of his or her own motion . . . , and in furtherance of justice, order an action to be dismissed."  (§ 1385, subd. (a).)  Defendant argues the trial court abused its discretion because the Colorado conviction was 30 years old, defendant was 18 at the time, and the Colorado court found that defendant did not initiate the kidnapping, did not know the victim was being held at gunpoint when he got into the car, was not armed, did not fire the fatal shot, tried to find alternatives to the shooter's plan, did not assist in burning the car, pled guilty, testified against the shooter, and lacked a prior record.[7]

### A.    Forfeiture

The Attorney General notes that, after the jury convicted defendant, he filed multiple motions to strike the prior conviction, arguing that the Colorado conviction did not qualify as a prior serious or violent felony (i.e., a strike), or was an "illegal enhancement," all of which the trial court denied.  Defendant did not style these filings as motions to strike a strike under (1) section 1385, (2) *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529-530, in which the California Supreme Court held that the power to dismiss an action under section 1385 includes the power to strike prior conviction allegations, or (3) *People v. Williams* (1998) 17 Cal.4th 148, 152 (*Williams*),

---

[7] Defendant relies on an order by the Colorado court submitted as an exhibit to his pretrial motions to strike or exclude evidence of the prior conviction.  In the order on defendant's motion to reconsider his sentence on the Colorado conviction, the Colorado court discussed factors in favor of a downward modification of his sentence, but noted that defendant had an opportunity to save the life of the victim when his codefendant was outside the vehicle in a store and defendant was alone in the car with the keys and could have driven away.

19

where the court provided guidance on how appellate courts should "undertake to rule and review in this area." The Attorney General therefore maintains defendant forfeited the issue on appeal. We disagree.

In sentencing defendant, the trial court commented that it did not see a specific request under *Romero* or *Williams* but gathered that "the argument perhaps of counsel was a request to strike the strike." The court then stated its reasons for not granting the request: the current offense was a serious and violent felony, defendant was involved in planning the crime, Kennedy was tied up, and defendant was "not a passive participant" but "the leader of the group, bringing everybody to the home of his cousin." The court acknowledged that the prior conviction was 30 years old as a factor in favor of granting the request, but "on balance, it didn't outweigh [other factors enough] to strike that particular strike."

In *People v. Carmony* (2004) 33 Cal.4th 367 (*Carmony*), the California Supreme Court explained that "a defendant has no right to make a motion, and the trial court has no obligation to make a ruling, under section 1385. But he or she does have the right to 'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice.' [Citation.] . . . [Citation.] . . . . [A]ny failure on the part of a defendant to invite the court to dismiss under section 1385 following *Romero* waives or forfeits his or her right to raise the issue on appeal. [Citation.]" (*Id.* at pp. 375-376.)

However, defendant did invite the court to exercise its discretion to strike the strike. In his sentencing statement, defendant argued: "The court is not bound by the District Attorney's decision to charge [defendant] with a prior conviction for a crime committed in his youth and for which he served his sentence. The court has the ability to find that [defendant] has paid his debt for that conviction, which is remote in time, which he was prosecuted on a derivative/vicarious liability theory for, and for which, at the time

20

of conviction, the three strikes law was not in existence so [defendant] could not possibly have known its ability to be dredged up thirty years later. The court may consider that [defendant] in fact testified as a government witness against the killer in that case, exposing himself to peril while incarcerated. The court should consider that in the thirty years since that conviction, [defendant] has lived a productive life despite the impediment of spending nearly the first decade of his adult life incarcerated."

Accordingly, the trial court acknowledged that it was being called upon to decide whether to strike the prior conviction because defendant fell outside the spirit of the three strikes law. Nothing further was needed to preserve the issue for appeal. (See *Polanski v. Superior Court* (2009) 180 Cal.App.4th 507.)

### B. Legal Standard

We conclude, however, that the trial court did not abuse its discretion under section 1385. " '[T]he Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders.' [Citation.] To achieve this end, 'the Three Strikes law does not offer a discretionary sentencing choice . . . but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' [Citation.]" (*Carmony, supra*, 33 Cal.4th at p. 377.)

Our high court has established "stringent standards that sentencing courts must follow in order to find such an exception." (*Carmony, supra*, 33 Cal.4th at p. 377.) The court " 'must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously

21

been convicted of one or more serious and/or violent felonies.' " (*Ibid.*) "Thus, the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Id.* at p. 378.)

The burden is on defendant to show clearly that the court's decision was irrational or arbitrary. (*Carmony, supra*, 33 Cal.4th at p. 376.) Absent this showing, the trial court is presumed to act to achieve legitimate sentencing objectives and its discretionary decision will not be aside on review. (*Id.* at pp. 376-377.) A decision will not be reversed because reasonable people may disagree. (*Id.* at pp. 377, 378.) Where the record shows that the trial court balanced the relevant factors and reached an impartial decision in conformance with the spirit of the three strikes law, a reviewing court will affirm even if it would have ruled differently. (*Id.* at p. 378.) A trial court will abuse its discretion in failing to strike a prior felony conviction only under extraordinary circumstances where no reasonable minds could differ that the defendant falls outside the spirit of the three strikes scheme. (*Ibid.*)

**C.     Analysis**

Defendant "finds himself in the difficult position of having to rebut the 'strong presumption' [citation] that the trial judge properly exercised his discretion in refusing to strike a prior conviction allegation." (*In re Large* (2007) 41 Cal.4th 538, 551.) Defendant has not rebutted the presumption. The trial court considered that the prior conviction was 30 years old. But the court concluded that the circumstances of the current offense outweighed that factor. The current offense was a serious and violent home invasion robbery. Defendant was the leader in planning to rob his cousin. In the middle of the night at home in a remote location, the victim encountered three men, was

thrown on the ground, and tied up and bound.[8]

Defendant argues he "had a 30-year old felony strike conviction where the facts of the case as found true by the Colorado court show in many respects that [defendant] was in the wrong place at the wrong time. [Defendant's] history was not so bad as to make the imposition of a 17-year term in state prison at his advanced age an appropriate sentence for stealing from his cousin and tying up a man in the process." Even accepting defendant's summary of the relevant facts, that defendant can make a good case for striking a prior conviction in furtherance of justice does not compel reversal. (*Carmony, supra*, 33 Cal.4th at p. 378.) Defendant has not shown the trial court's decision was so irrational and arbitrary that no reasonable person could agree with it. (*Id.* at pp. 377, 378.)

## III.    Senate Bill No. 1393

Defendant contends we should remand this case for the trial court to exercise its discretion under the amendment to section 1385 enacted by Senate Bill No. 1393 (2017-2018 Reg. Sess.) to strike the five-year enhancement imposed under section 667, subdivision (a), for a prior serious felony conviction.

On September 30, 2018, the Governor signed Senate Bill No. 1393, effective January 1, 2019, which amended sections 667, subdivision (a), and 1385, subdivision (b), to permit a court to exercise discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971;

---

[8] Similarly, in selecting the midterm for defendant's robbery conviction, the court found: "The crime involved violence. It was planned, driving from Texas to California to carry out. The defendant brought with him two other participants from Texas. Defendant knew the home and its likely contents as he formerly resided there with his cousin who was the homeowner. [¶] The tenant victim was awoken in the middle of the night, and following the opening of the front door, was knocked to the ground and tied up . . . which evidence is, in this Court's view callousness and cruelty."

23

Stats. 2018, ch. 1013, §§ 1-2.)  The prior versions of these statutes required the court to impose a five-year consecutive term for any person convicted of a serious felony and the court had no discretion to strike any prior conviction for purposes of the five-year enhancement.  (*Garcia, supra*, at p. 971.)

On June 3, 2019, the trial court sentenced defendant on the robbery conviction to an aggregate term of 17 years, as well as 13 years on the stayed sentence for burglary; both sentences included five years for the prior serious felony under section 667, subdivision (a)(1).  The record is silent regarding whether the trial court was aware of its discretion to strike the prior serious felony enhancements.  Defendant did not ask the trial court to exercise its discretion to strike the enhancements and the court did not refer to its discretion to do so.  Defendant argues that "remand is the appropriate remedy because the record does not reflect that the trial court realized it had discretion to strike the nickel priors at the time of sentencing, and thus never gave this type of sentencing option any consideration when imposing the 5-year terms to [defendant's] sentence."

"Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing.  [Citations.]  Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion.  [Citation.]" (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)  However, "remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion.  Error may not be presumed from a silent record.  [Citation.] ' "[A] trial court is presumed to have been aware of and followed the applicable law." [Citations.]' [Citation.]" (*Id.* at p. 1229.)

Defendant refers to the court's discretion under the amended statutes as "recently granted to it by the Legislature."  But the defendant was sentenced more than four months

after Senate Bill No. 1393 became effective.  We decline to speculate that the trial court remained ignorant for months of this significant amendment to section 1385, which was part of a larger legislative trend towards leniency in sentencing.  On this record, we cannot conclude that the trial court was unaware of its discretion.

## IV.    Colorado Strike

Defendant claims the trial court erred in declining to strike a prior conviction in Colorado for second degree murder, which doubled the term the court imposed for home invasion robbery under the three strikes law.[9]  Defendant argues that his actions as summarized in the Colorado court's order granting his motion for reconsideration of his sentence do not constitute implied malice second degree murder under California law and the Colorado murder statute is broader than the California statute.

We disagree.  Based on a comparison of Colorado and California statutes and the court's findings in the Colorado order, the California trial court did not abuse its discretion in denying defendant's motions contending that the Colorado second degree murder conviction did not qualify as a strike under the three strikes law.

### A.    Procedural Background

On October 10, 2018, the prosecution filed an information alleging that defendant had suffered prior convictions for second degree murder and kidnapping in Colorado.  In response, defendant made three motions to disqualify his Colorado conviction as a strike in California.

First, defendant filed a motion to strike the prior conviction allegation as constitutionally invalid.  Defendant argued "the Colorado statutes proscribe broader

---

[9]  Under the three strikes law, the sentence is enhanced upon proof the defendant has been previously convicted of a strike, i.e.,  a "serious felony" as defined in section 1192.7, subdivision (c), or a "violent felony" as defined in section 667.5, subdivision (c). (§§ 667, subd. (f)(1), 1170.12, subd. (d)(1).)  Second degree murder qualifies as a strike because it is both a serious and violent felony.  (§§ 667.5, subd. (c)(1), 1192.7, subd. (c)(1).)

conduct than their California equivalents, and have different *mens rea* elements. California requires malice for murder, Colorado does not. California requires force or fear be used to effectuate a kidnapping, Colorado kidnapping includes movement by trickery or deceit."

The trial court granted the motion as to the kidnapping conviction but denied it as to the second degree murder conviction. The court ruled: "For our purposes, we're concerned with the parallel between Colorado's second-degree murder statute and our implied malice [murder statute] in California. [¶] In California, implied malice requires the defendant's awareness of engaging in conduct that endangers the life of another. In Colorado, a person commits murder in the second degree if he causes the death of a person knowingly, but not after deliberation. Under Colorado law, a person acts knowingly when he is aware that his conduct is practically certain to cause the result. Colorado's second-degree murder conviction satisfies the definition of second-degree murder under the implied malice theory in California, in my view. Looking to the specific facts, as articulated by the Colorado judge in the amended sentencing [order], I think the result is clear."

Second, defendant made the same arguments regarding the distinction between the Colorado and California statutes in a motion in limine to exclude evidence of defendant's prior convictions. And the trial court made the same ruling, granted in part and denied in part. The court said: "I do not believe the Colorado second-degree murder statute is broader than California's statute. [This ruling] mirrors, in large part, my ruling I made in the other matter."

After the court found true the allegation that defendant suffered a prior conviction for second degree murder in Colorado, defendant filed a motion to strike the allegation. Defendant argued "[t]he Colorado statute proscribes broader conduct than its California equivalent, has a different *mens rea* element, and prohibits the defense of voluntary intoxication, a defense that California explicitly allows in a vicarious liability situation."

26

Noting that "[t]his motion is almost identical" to the motion in limine previously denied, the trial court issued a written ruling denying the motion.

**B.      Legal Standard**

" ' "In order for a prior conviction from another jurisdiction to qualify as a strike under the Three Strikes law, it must involve the same conduct as would qualify as a strike in California." ' [Citation.] 'The People must prove all elements of an alleged sentence enhancement beyond a reasonable doubt.' [Citation.] However, ' "the trier of fact must be permitted to go beyond the least adjudicated elements of the offense and to consider, if not precluded by the rules of evidence or other statutory limitation, evidence found within the entire record of the foreign conviction." ' [Citations.] Only where the record of conviction does not disclose facts relevant to the underlying offense does the court presume that the prior was for the least offense punishable under the foreign law. [Citations.]" (*People v. Chubbuck* (2019) 43 Cal.App.5th 1, 12; *People v. Denard* (2015) 242 Cal.App.4th 1012, 1024.)

**C.      Analysis**

In California, murder is the killing of a human being with malice aforethought. (§ 187, subd. (a).) "[M]alice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) Implied malice contains a physical and a mental component. (*People v. Guillen* (2014) 227 Cal.App.4th 934, 984.) " ' "The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' [Citation.]" [Citation.]' [Citations.]" (*Ibid.*; *People v. Bryant* (2013) 56 Cal.4th 959, 965.) Thus, implied malice requires a defendant's awareness of engaging in conduct that

27

endangers the life of another.  (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

Defendant pled guilty to second degree murder under Colorado law in 1989.  At that time, the relevant provision of the Colorado Revised Statutes (CRS) stated, "[a] person commits the crime of murder in the second degree if:  (a)  He causes the death of person knowingly, but not after deliberation."  (CRS § 18-3-103(1)(a); *People v. Mingo* (Colo. 1978) 584 P.2d 632, 633 (*Mingo*).)[10]  One acts knowingly when "he is aware that his conduct is practically certain to cause the result."  (CRS § 18-1-501(6).)

Defendant contends that (1) the findings of the Colorado court establish that he did not act with malice under sections 188 and 189, subdivision (e), of California law, and (2) Colorado law "is the broader law" in several respects, including that Colorado does not allow voluntary intoxication as a defense, malice is a necessary element of second degree murder in California but not in Colorado, and "there is no equivalent in Colorado of Senate Bill 1437 in California, which limits murder in situations such as the prior conviction at issue here."

Previously in Colorado "the required mental state was malice" for murder. (*Mingo, supra*, 584 P.2d at p. 633.)  In 1997, Colorado adopted language suggested by the Model Penal Code and substituted the term "knowingly" in its definition of second degree murder.  (*Mingo, supra*, at p. 633.)  Under this definition, "the prosecutor must establish two factors to prove second-degree murder.  The first is that death was more than merely a probable result of defendant's actions; and the second is that the defendant was aware of the circumstances which made death practically certain."  (*Ibid.*)  "The first element is objective; the second is subjective.  [Citation.]"  (*Mata-Medina v. People.* (Colo. 2003) 71 P.3d 973, 978.)

---

[10]  The current version of CRS section 18-3-103(1) provides:  "A person commits the crime of murder in the second degree if the person knowingly causes the death of a person."

*People v. Martinez* (1991) 230 Cal.App.3d 197 (*Martinez*), is instructive on the equivalence between states guided by the Model Penal Code and California regarding the definition of murder. In *Martinez*, the People appealed the trial court's denial of the prosecution's motion to reinstate a prior murder special circumstance based on defendant's 1980 Texas murder conviction. (*Martinez, supra*, at p. 199) The appellate court observed that "[u]nder Penal Code section 19.02, subdivision (a)(1) of Vernon's Texas Codes Annotated, 'A person commits [murder] if he . . . intentionally or knowingly causes the death of an individual.' " (*Id*. at p. 203.) Texas's definition of murder was taken from the Model Penal Code, which dispensed with the term "malice aforethought." (*Martinez, supra*, at p. 203.) The court concluded that "the mental states of 'intentionally' or 'knowingly' are the functional equivalents of 'express malice' or 'implied malice, respectively' " under California law. (*Ibid.*)

The court noted that commentary to the Texas murder statute indicated the use of the terms "knowingly" and "intentionally" was not intended to introduce novel concepts to the definition of murder, "but, rather, define the traditional mens rea concept of malice in more precise and comprehensible language."[11] (*Martinez, supra*, 230 Cal.App.3d at p. 204.) An intentional killing is the same as express malice murder. (*Id.* at pp. 204-205.) "[A] knowing killing under Texas law would be one where a defendant is aware of the nature of the defendant's conduct, or is aware of the circumstances surrounding that

_____

[11] The Model Penal Code provision adopted by states like Colorado and Texas was an attempt at penal law reform by using only four culpable mental states: "purposely, knowingly, recklessly, and negligently." (1 Wharton's Criminal Law (15th ed. 1993) § 27, p. 166, citing Model Pen. Code, § 2.02(2).) The objective was to provide a clearer definition of culpable mental states than common law concepts such as "malice." (Model Pen. Code & Commentaries, com. 1 to § 2.02, p. 230.) Under the Model Penal Code, "[a] person acts knowingly 'with respect to his conduct or circumstances surrounding his conduct when he is aware of the nature of his conduct or the existing circumstances. A person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result,' " the definition adopted in Colorado as CRS section 18-1-501(6). (Wharton, *supra*, p. 167 & fn. 24.)

conduct, and is further aware that death of another person is reasonably certain to result from that conduct." (*Id.* at p. 205.)

The Texas definition of a knowing killing and California's definition of implied malice "both focus on the subjective awareness, or knowledge, of the defendant. In Texas, a defendant knowingly causes the death of another, and thus commits murder, when the defendant is subjectively aware that death is 'reasonably certain to result' from the defendant's conduct. In California, a defendant kills another human being with implied malice, and likewise commits murder, when the defendant is subjectively aware of the life-threatening risk involved in the defendant's conduct. [Citation.]" (*Martinez, supra*, 230 Cal.App.3d at p. 205.) A knowing killing in Texas fits the California definition of implied malice murder. (*Id.* at pp. 205-206.) The appellate court in *Martinez* reversed the trial court's order and directed it to enter a new order granting the prosecution's motion. (*Id.* at p. 206.)

Defendant's appeal from the ensuing first degree murder conviction and death sentence was automatic. (*People v. Martinez* (2003) 31 Cal.4th 673 (*Martinez II*).) In *Martinez II,* the defendant again maintained that the Texas murder conviction could not support a special circumstance. (*Id.* at p. 678.) The California Supreme Court held this issue was barred by the law of the case doctrine. (*Id.* at p. 683.) However, "to demonstrate that no manifest misapplication of law occurred here" (*id.* at p. 683), the court analyzed the equivalence of the elements of murder in Texas and California and agreed with the intermediate court that the Texas murder conviction qualified as a prior murder under California's special circumstance provision. (*Id.* at p. 684.)

The court noted that, according to the prosecutor and the appellate court in *Martinez*, "before defendant committed his Texas murder, Texas substantially adopted the Model Penal Code to simplify criminal statutes *without changing the substantive law*, by discarding former references to mens rea and malice, and substituting language defining murder as 'intentionally or knowingly caus[ing] the death of an individual.'

30

(Tex. Pen. Code, § 19.02, subd. (b)(1); see Tex. Pen. Code, § 6.03, subds. (a), (b) [defining these mental states].)  Indeed, the framers of the Model Penal Code stated that '[m]urder is defined in Section 210.2 to include cases where a criminal homicide is committed purposely, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life,' and opined that these 'concepts provide a more satisfactory means of stating the culpability required for murder than did the older language of "malice aforethought" and its derivatives.'  (Model Pen. Code & Commentaries, com. to § 210, p. 2; see also *id.*, pp. 13-19.)"  (*Martinez II, supra*, 31 Cal.4th at p. 686.)

The court observed that the defendant failed to cite "Texas authorities holding that the 1974 adoption of the Model Penal Code definitions for the requisite mental states for murder necessarily abandoned the concepts of express or implied malice and created *lesser* standards in their place."  (*Martinez II, supra*, 31 Cal.4th at p. 687.)  Turning to the language of the Texas statute, including that "one acts knowingly 'with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result,' " the court found that the defendant by "admitting he knowingly caused a death, he admitted he was aware death was reasonably certain to occur."  (*Id.* at p. 688.)  Thus, "defendant's guilty plea included . . . all the elements required by California law to constitute implied malice and second degree murder."  (*Ibid.*)

We come to the same conclusion regarding the equivalence between the Colorado statutes based on the Model Penal Code and implied malice murder in California.

Defendant cites *People v. Gladney* (Colo. 1977) 570 P.2d 231, which held that failure "to instruct the jury that malice is an essential element of second degree murder" was not error "since the express statutory definition of the crime . . . does not include malice as an element."  (*Id.* at pp. 235-236.)  As we have explained, states such as Texas and Colorado that adopted the Model Penal Code substituted the term "knowing" to clarify the culpability concept formerly captured under the term "malice."  But there was

31

no change to the substantive law, which, in Colorado as in California, provides that a person aware that his or her conduct is reasonably certain to result in death, or that his or her conduct poses a life-threatening risk to another, is guilty of second degree murder. (*Martinez II, supra*, 31 Cal.4th at p. 686; *Martinez, supra*, 230 Cal.App.3d at pp. 205-206; 40 C.J.S. (June 2021 update) Homicide, § 99 ["Although under some statutes malice is not an essential element of second-degree murder, in the absence of a statute to the contrary, the equivalent of common-law malice or malice aforethought must be present to constitute murder in the second degree" (fn. omitted)].)

Equally unavailing is defendant's contention that Colorado is the broader statute because "Colorado's definition of knowledge removes the possibility of voluntary intoxication as a defense, whereas in California it is a defense." Defendant relies on *People v. Soto* (2018) 4 Cal.5th 968 (*Soto*). However, in *Soto*, the California Supreme Court said that "a defendant who acts with conscious disregard for life should be punished for murder regardless of whether voluntary intoxication impaired his or her judgment." (*Id.* at pp. 977-978.) Thus, " ' "voluntary intoxication is irrelevant to proof of the mental state of implied malice or conscious disregard." ' " (*Id*. at p. 981; see also *People v. Timms* (2007) 151 Cal.App.4th 1292, 1300; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 690-693.)[12]

Lastly, defendant argues that "one can survey the law in Colorado to see that there is no equivalent in Colorado of Senate Bill 1437 in California, which limits murder in

[12] Evidence of intoxication is admissible in California in the limited context of the specific intent component of aider and abettor liability. The court in *Soto* rejected application of this exception outside of that context. (*Soto, supra*, 4 Cal.5th at p. 979.) Nothing in the record suggests that defendant was convicted of second degree murder in Colorado on an aider and abettor theory. To the contrary, the Colorado court's order amending his sentence indicates defendant committed second degree murder by his independent conduct of choosing not to save the victim knowing that he was going to be killed.

situations such as the prior conviction." In Senate Bill No. 1437 (2017-2018 Reg. Sess.), effective January 1, 2019, the Legislature declared it was necessary to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

Senate Bill No. 1437 amended section 188, defining malice, to provide that "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in the crime." (§ 188, subd. (a)(3).) Section 189, subdivision (e), in relevant part limits felony murder to certain circumstances, including where "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e)(3).)

The trial court observed, "as described in the Colorado Court's ruling, Defendant's sitting in the car and allowing the victim to be murdered by the other participant constitutes reckless indifference to human life." We agree. The defendant had an opportunity to save the victim's life but chose not to and as a result the victim was killed. Defendant's explanation that he did not drive away because he was fearful that the shooter would injure others in a rage showed he understood how dangerous the shooter was.[13]

---

[13] The Attorney General argues that the Colorado court's order cannot be considered in determining whether the Colorado conviction qualified as a strike, because it was not inherently admitted as a result of defendant's guilty plea. (*People v. Gallardo* (2017) 4 Cal.5th 120, 136.) The Attorney General also argues the opposite, that defendant forfeited the argument that the trial court improperly considered outside information by failing to object and invited error by encouraging the court to consider such information. On appeal, defendant asserts that under the Sixth Amendment the only facts the court could consider are those constituting elements of the offense. (*Descamps v. United States*

We conclude defendant's second degree murder conviction in Colorado satisfies the definition of implied malice murder in California.  The trial court properly denied defendant's motions to strike the prior conviction allegation.

**DISPOSITION**

The judgment is affirmed.

    /s/
RAYE, P. J.

We concur:

    /s/
BLEASE, J.

    /s/
KRAUSE, J.

---

(2013) 570 U.S. 254, 264, 271 [186 L.Ed.2d 438].)  But defendant enumerates the findings the Colorado court made in reconsidering defendant's sentence as supporting his argument that his conviction in Colorado did not qualify as a strike in California.  On reply, defendant further argues he has not forfeited an objection to the court's consideration of the document he submitted or, if he did forfeit, this constituted ineffective assistance of trial counsel.  Suffice it to say, whether we consider the Colorado court's order or only the Colorado statutes, the result is the same:  defendant's second degree murder conviction in Colorado qualified as a strike under California law.